Argued January 20, affirmed March 5, petition for rehearing
denied March 30, petition for review denied May 11, 1971

STATE OF OREGON, *Respondent,* v.
ELMER J. DIXON, *Appellant.*
481 P2d 629

*Robert J. McCrea*, Eugene, argued the cause for appellant. With him on the briefs were Mulder, Morrow & McCrea, Eugene.

*Thomas H. Denney*, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and Jacob B. Tanzer, Solicitor General, Salem.

Before Schwab, Chief Judge, and Foley and Thornton, Judges.

FOLEY, J.

From a jury conviction and sentence of six years for armed robbery, defendant appeals.

At approximately 7:30 on the evening of February 15, 1969, one Michael Mostyn was accosted on a Eugene, Oregon, street by two men and robbed at

pistol point of his leather jacket and some $2.80 in cash. The additional facts necessary to an understanding of the issues are presented with the discussions of the eleven assignments of error. The subjects involved and the assignment numbers appear under the respective headings.

## MOTION TO SUPPRESS EVIDENCE
### (Assignment No. I)

■ Defendant assigns as error the court's failure to grant his motion to suppress as evidence a brown leather jacket taken from defendant by Seattle, Washington, police. The jacket was identified at trial as the one taken from the victim of the robbery.

Defendant contends that the state must rely on one of two theories to sustain a valid admission of the jacket in evidence: (1) that the jacket was discovered and seized as a result of a search conducted with defendant's consent, or (2) that it was seized during a search made pursuant to a lawful arrest. We disagree for the reasons hereinafter stated.

At the time of the robbery defendant resided in Seattle, Washington. On February 15, 1969, he traveled by bus to Eugene to participate in a Black Panther Party organizational meeting. After being in Eugene for several hours, defendant departed by bus at approximately 8:30 that evening and arrived in Seattle about 1:45 a.m. of February 16.

While the bus carrying defendant was en route to Seattle, the Eugene police department communicated to the Seattle police department a detailed physical description of a suspect in an armed robbery and a description of the knee-length black leather jacket with a "P" symbol on the left lapel worn by one

of the robbers. Defendant was named as the potential suspect and the Seattle police were advised that he had been seen passing through Portland on a Seattle-bound Greyhound bus. They were also given a description of a coat which had been taken in the robbery, a somewhat out of the ordinary three-quarter length brown leather jacket.

Acting on the basis of this information two Seattle police officers, Johnson and Evans, went to the Greyhound bus depot and met the bus from Portland. Defendant matched the description given and when he alighted from the bus was accompanied by two other Negro males. Defendant was wearing a long black leather jacket with a lapel button. As defendant exited the bus, Officer Evans, who thought it "was Elmer Dixon, but * * * wasn't * * * for exact sure that it was," approached him and asked for identification. As defendant put his hand in his left jacket pocket, the motion spread his outer jacket and Officer Johnson saw some brown leather underneath which appeared to be a brown jacket.

At this point the officers had probable cause to arrest the defendant.

> "Probable cause to arrest is the sum total of information and the synthesis of what the police have heard, what they know and what they observe as trained officers * * *." *State v. Shaw* 3 Or App 346, 473 P2d 159, Sup Ct *review denied* (1970). See also, *State v. Pederson,* 102 Ariz 60, 424 P2d 810, cert den 389 US 867, 88 S Ct 138, 19 L Ed 2d 142 (1967).

Here the detailed description of the robbery suspect had been duly relayed to them. The defendant fit the detailed description, was believed by the of-

ficers to be the named individual, and had on, under his black jacket, a brown leather one.

"* * * Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. * * *" *Brinegar v. United States*, 338 US 160, 175-76, 69 S Ct 1302, 93 L Ed 1879, reh den 338 US 839, 70 S Ct 31, 94 L Ed 513 (1949). See also, *Henry v. United States*, 361 US 98, 80 S Ct 168, 4 L Ed 2d 134 (1959); *State v. Diaz*, 3 Or App 498, 473 P2d 675, Sup Ct *review denied* (1970).

The defendant, then, upon request removed the brown leather jacket and gave it to the police. It was introduced in evidence at the trial and identified as the stolen jacket.

■ Whether the police did, in fact, arrest the defendant at the time they had probable cause to do so is immaterial in determining the reasonableness of the search which resulted in the seizure of the stolen jacket.

"* * * The relevant issue is not whether the defendant was arrested, but whether the warrantless search was based on probable cause. * * *" *State v. Murphy*, 2 Or App 251, 465 P2d 900, Sup Ct *review denied, cert denied*, 400 US 944, 91 S Ct 246, 27 L Ed 2d 248 (1970). See also, *State v. Erickson*, 4 Or App 119, 476 P2d 944 (1970); *State v. Diaz*, supra.

Defendant's motion to suppress was properly denied.

### IN-COURT DESCRIPTION OF ROBBER
### (Assignment No. III)

■ Over defendant's objection the victim of the robbery was permitted to describe in some detail one

of his two robbers. Defendant contends that the court's ruling was in conflict with its previous determination that the victim's pre-trial identifications of defendant by photographs and in-person observation be suppressed, presumably because defendant's attorney was not present, and that no in-court identification be allowed. The original ruling was apparently based on the court's belief that the *Wade* and *Gilbert*[①] decisions of the United States Supreme Court require that, absent a knowing and intelligent waiver, an accused's counsel be present at any photographic identification procedure conducted after the accused is in custody. We do not, however, reach the question of whether the trial court correctly interpreted those decisions for we are, in any event, faced with the second question presented in the *Wade* case, that is,

> " * * * ' "[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint" * * *.'" *United States v. Wade*, 388 US 218, 241, 87 S Ct 1926, 18 L Ed 2d 1149 (1967).

Applying this test to the instant case we must determine from the record whether the victim's in-court description of one of the robbers, in effect an identification of defendant, had an origin independent of the photographic identifications. See *State v. Mershon*, 1 Or App 305, 459 P2d 551 (1969), Sup Ct *review denied* (1970).

The challenged description was as follows:

"A (By the witness) Uh, like I stated earlier, he was about six-one to six-three, Afro-American;

---

[①] United States v. Wade, 388 US 218, 87 S Ct 1926, 18 L Ed 2d 1149 (1967); Gilbert v. California, 388 US 263, 87 S Ct 1951, 18 L Ed 2d 1178 (1967).

he had an Afro-American-type haircut. Uh, let's see. Uh, slight in, in build; at that time was wearing a dark leather, or imitation leather, jacket, that appeared to be shorter than mine; and had buttons that went down the front of it. He also had a, about an inch growth of hair on his chin. And had, it seemed, that his hair had been messed up in some way, because it didn't look at all ruly.

"Q (By Mr. Melevin) Now, would you have an estimate as to his weight?

"A I believe I estimated the weight to the police at about 165, 170.

"Q Now, you have indicated that he had an Afro-American haircut. Could you describe what that is to the jury? Some of them may not be familiar with that.

"A Well, it seems to be the style now to cut it as if it were a helmet, that it is very precisely cut, and it's done right it looks very neat. It comes across the top, down across the ears, and down the back, and looks like it's sort of placed on the head, and the only difference between his and most others is that it seemed to be messed up, and it came out in some direction, and, you know, it wasn't completely smooth.

"Q He did have one-inch growth on his chin. Would you describe that as a goatee?

"A Yes, sir."

Essentially the same description was transmitted a few hours after the robbery by a Eugene police lieutenant to Seattle police headquarters. During the course of his testimony, one of the officers who arrested defendant in Seattle gave a similar description as the one relayed to him by his superior officer. In evidence are three full-length color photographs of defendant, taken on February 19, 1969, which portray him as he appeared when the police transported him from Seattle

to Eugene. The description in question could well apply to those pictures.

Mr. Mostyn, the victim, testified that the robbery lasted for a minute to a minute and a half. During a portion of this time defendant and Mostyn stood face to face, a pistol inches from the victim's stomach. This confrontation afforded Mr. Mostyn ample opportunity to observe and note the robber's physical features and dress.

A few hours after the robbery the victim thumbed through a stack of approximately 50 police "mug shots" in search of his attacker. All photographs were of Negro males, apparently between the ages of 18 and 35. Mr. Mostyn identified none of them. Defendant's picture was not in the stack. Five days later, on February 20, Mostyn again examined a group of photos. Thirteen of the fourteen pictures are black and white police "mug shots" of young Negro males showing one frontal and one side view of each subject from the chest area up. Defendant's "mug shot" was among these. The fourteenth photograph differs from the rest in that it contains only a frontal view of the subject. Mr. Mostyn unequivocally selected defendant as the one who had robbed him. He again saw this picture on two subsequent occasions, the last being just prior to trial. Although the victim could have relied on the photograph in describing defendant's facial features, nothing in the picture would assist him in detailing the weight, height or dress of the man who robbed him.

We conclude that the record shows, by clear and convincing evidence, that the victim's in-court description of one of his assailants was based upon his observations at the time of the robbery, not upon any

subsequent identification, photographic or otherwise. See *State v. Mershon*, supra. Defendant's objection was properly overruled.

## MOTION TO INTERROGATE THE JURY
### (Assignment No. IX)

■ The trial recessed for the weekend on Friday evening, October 24, 1969. On Sunday there appeared in the "Emerald Empire," the magazine section of the Eugene Register-Guard newspaper, a four-page article on the Eugene Black Panther Party. The article featured excerpts from interviews with several party members including one person listed in a notice, filed in the case the previous Wednesday, as an alibi witness for defendant. Mention was also made of two other alibi witnesses who actually did testify for the defense. The article contained no reference to defendant or his trial. When court reconvened on Tuesday, October 28, defendant moved the court to inquire of the jurors whether any one of them had read the article and, if so, whether he was influenced thereby so as to endanger defendant's right to a fair trial. After a lengthy discussion the motion was denied.

> "The trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial. * * * [E]ach case must turn on its special facts. * * *" *Marshall v. United States*, 360 US 310, 312, 79 S Ct 1171, 3 L Ed 2d 1250 (1959). See also, *State v. Clipston*, 3 Or App 313, 473 P2d 682 (1970); *State v. Elkins*, 248 Or 322, 432 P2d 794 (1967); *Hilliard v. State of Arizona*, 362 F2d 908 (9th Cir 1966).

This court will find error only for an abuse of that discretion.

Prior to recessing court on Friday, October 24, the trial judge instructed the jury not to read or look at anything in the news media concerning the trial. "The jury is presumed to have followed the court's instruction." *State v. Oland,* 1 Or App 272, 461 P2d 277 (1969), Sup Ct *review denied* (1970). However, as defendant points out, the article was not actually about the trial and one or more jurors might well have read it believing they were not violating the court's instructions. We recognize this possibility despite the fact that defendant's membership in and active participation in the Black Panther Party was eminently clear to the jury from the outset of the trial. This latter fact, however, leads us to the conclusion that the trial court did not abuse its discretion in refusing to examine the jury.

In the voir dire examination of prospective jurors, defense counsel questioned the candidates on their attitudes toward the Black Panthers. Eventually a jury was selected which defense counsel must have been satisfied would try the case impartially on the evidence presented.[2] During his opening statement defense counsel again raised the matter of defendant's party affiliation. The Black Panther name was mentioned throughout the trial in one regard or another. Finally, in his closing argument, defense counsel again discussed the Black Panthers. He saw fit to advise the jury that most, if not all, Black Panthers carry guns, and weapons are also kept at party headquarters.

We have examined the article in question and, in view of the totality of circumstances, do not believe

---

[2] Counsel assigns as error the court's failure to excuse a juror for cause in connection with a matter not related to this issue. We shall discuss it subsequently herein.

that it is so highly inflammatory that the mere possibility that one or more jurors read it required the trial court to examine the jury on the matter. Each juror stated during the voir dire examination that defendant's Black Panther Party membership would not influence that juror's ability to judge defendant's guilt or innocence fairly on the evidence. We see no reason to assume that the article in question would alter this condition. Under the circumstances we do not feel that the court abused its discretion in denying defendant's motion.

### CHALLENGE TO JUROR
#### (Assignment No. II)

■ The trial court denied defendant's request to dismiss a prospective juror, one Arthur C. Jones, for cause. Defendant assigns this as error, citing ORS 17.135 (2) and 17.145 which deal with jury challenges for actual bias. These statutes provide, and the Oregon Supreme Court has stated, that a challenge to a prospective juror for cause is addressed to the sound discretion of the trial court. *State v. Stigers*, 122 Or 113, 256 P 649 (1927); *State v. Brumfield*, 104 Or 506, 209 P 120 (1922). Our review of the record discloses no abuse of that discretion. In any event, Mr. Jones was the first juror to be peremptorily excused, and defendant claims no other prejudice from the refusal to excuse the juror for cause. Defendant's assignment is without merit.

### HEARSAY AND RELEVANCY OBJECTIONS
#### (Assignment Nos. IV, V, VI, VII and VIII)
#### (Assignment No. IV)

During the course of the state's direct examination of its chief witness, the victim, defendant

made several objections to questions concerning the victim's descriptions of his stolen jacket and of his assailant. The objections seem to be principally upon grounds of hearsay and relevancy.

■ Stripped of repetition and much nonessential discussion the challenged testimony was as follows:

"Q  [By Mr. Melevin]  Now, the description [of the stolen jacket] that you just told the jury, did you relate that to the police officers on the night that you were robbed?

"* * * [Objections and discussion.]

"A  * * * I believe I gave a similar statement to the police.

"* * * * *

"Q  Now, did you give a description of the, your assailant to the police on the night that you were robbed?

"* * * [Objection.]

"A  (By the witness)  Yes, I did.

"Q  (By Mr. Melevin)  And to the best of your recollection, what description did you give to the police?

"* * * [Objections and discussion.]

"MR. MELEVIN: If it please the Court, of course, the difficulty in this case, I think, was brought out in my opening statement, is the fact that this information was conveyed to officers in another state, the information that was given by the victim in this case, and of course, when I put the other officers on, Mr. McCrea will object because it's hearsay, and then I don't know any other way to do it, is to have him—

"THE COURT: In other words, it's your position in regard to this matter, Mr. Melevin, that these statements are preliminary to certain other evidence?

"MR. MELEVIN: That's correct.

"THE COURT: Objection overruled.

"* * * * * *

"Q (By Mr. Melevin) Mr. Mostyn, will you give, relate to the jury what description you gave to Officer Ziebert at your fraternity house on February 15, 1969?

"* * * [Objection.]

"A (By the witness) I believe I stated to the police that the assailant was about six-one, 170 pounds, slight, with an inch growth of hair, with a small goatee; believe that's it; and of course, the dress, the dark jacket with the pin.

"* * * * * *

"Q And did you describe his complexion to the officer, Ziebert, or his nationality?

"A Yes, I related that he was Afro-American. I can't honestly say whether I told him his complexion or not."

The first two questions asked by the prosecutor elicited no hearsay whatsoever. The witness simply stated that he had given certain descriptions to the police on the night of the robbery. The remainder of the testimony set out above presents a different problem, however. The witness related in court the description of his assailant which he had given to Officer Ziebert shortly after the robbery. Defendant argues that this was inadmissible hearsay.

■ In *State v. Planck,* 3 Or App 331, 473 P2d 694 Sup Ct *review denied* (1970), this court dealt with an analogous issue. We there cited *Marr et al v. Putnam et al,* 213 Or 17, 321 P2d 1061 (1958), in which the Oregon Supreme Court said:

"The exclusionary force of the hearsay rule is not applicable when the extra-judicial statement of a third person is not offered to prove the truth of the utterance, but only to show that the state-

ment was made. Where the mere fact that the statement was made is independently relevant, regardless of its truth or falsity * * * such evidence is admissible. * * *" 213 Or at 25.

The above discussion between the prosecution and the court indicates that the challenged statements were offered to show that the victim had in fact related descriptions of his assailant and of his stolen jacket to the police, rather than to prove the truth of those descriptions. All of the challenged testimony was relevant in light of the state's position, developed through subsequent testimony, that the Eugene police transmitted these descriptions to Seattle police headquarters where a police captain relayed the information to the two police officers who arrested defendant at the Seattle Greyhound bus depot several hours after the robbery. The court committed no error in admitting this testimony.

(Assignment No. V)

■ Again during the course of the victim's testimony defendant entered a hearsay objection, this time to the following testimony:

"Q [By Mr. Melevin] Would you explain to the jury why you feel, without any doubt, that this coat, which is Exhibit B, is the coat that was taken from you in the robbery?

"A Uh, first of all, the make of jacket is very rare. Uh, I was told at the time of purchase—

"MR. McCREA: Objected to; hearsay * * *.
"* * * * *

"THE COURT: * * * Overruled. Proceed.
"A (By the witness) At the time that I purchased the jacket, I was informed that Rosenblatts was the only outlet for such a jacket, that

they themselves imported it special for sale in the United States. * * *"

Defendant assigns as error the court's failure to sustain his objection.

We agree with defendant that this statement constitutes hearsay. It is the repetition in court of an extra-judicial statement offered to show the truth of the matter asserted therein. *State v. Christensen,* 3 Or App 442, 474 P2d 782 (1970). We do not, however, feel that the error requires reversal.

The merchandise manager of the Rosenblatts men's store in Portland testified at length about coats essentially the same as this one at issue here. He testified as to the number of this type of coat the store had purchased, the number it had sold, and the fact that he had never seen a coat identical in style to the one in evidence other than those purchased by his store. However, the witness admitted on cross-examination that possibly 2,000 stores nationwide would carry this particular type of coat. In light of this testimony and other evidence in the record, we conclude that the trial court's error in allowing the hearsay testimony was so unsubstantial that no prejudice to defendant resulted. *State v. McLean,* 255 Or 464, 468 P2d 521 (1970).

(Assignment No. VI)

Immediately after making the above objection, defendant challenged the form and relevancy of the prosecutor's question as to whether the victim had any special feelings about his coat at the time he purchased it, or subsequently thereto. The court permitted the witness to respond:

"A   (By the witness) I had been looking for,

or had been looking for quite some time, for a good overcoat that could fit just about all the purposes I had in mind for it; that I had saved the money; and that the, that the money I had accumulated was to go towards this jacket, you know, that I would, presumed I would find. When I found this particular jacket at Rosenblatt's, I obviously liked it, because I purchased it for a little more than I thought it was worth, but still, you know, appreciated its value."

Defendant sets out a nebulous, one-paragraph argument to support his objection, but both it and the challenged testimony are so insignificant as to warrant no further discussion. *State v. McLean*, supra.

## (Assignment Nos. VII and VIII)

Shortly after the robbery occurred, several members of the Eugene police department, one accompanied by the victim, proceeded to the vicinity of the Greyhound bus depot apparently in search of the persons responsible for the robbery. A red Comet automobile similar to one which the victim testified discharged his two assailants immediately prior to their confrontation was observed parked in the bus station parking lot. Ten to twenty Negro men were gathered at the depot. Several of these Negro men boarded a bus which departed at about 8:30 p.m. No confrontation between police and any of this group occurred at the bus depot.

Two Eugene police officers testified that they had issued orders to policemen in the vicinity of the bus station not to enter the depot or to make contact with any person there. When asked why they had issued these orders, both officers replied that they had been concerned for the safety of all the people present

at the bus depot. Defendant objected to this line of testimony on the ground that any such instructions, as well as the motives for issuing them, were irrelevant to the issues involved in this trial. He contends further that the testimony prejudicially established that the black persons at the bus station were dangerous.

■ The chain of events leading up to defendant's arrest when he departed the bus upon its arrival in Seattle was relevant. An explanation of the course of action followed by the police was also relevant in light of their failure to confront defendant at the bus depot immediately after the robbery while the victim was on hand to make an identification. Failure to state such explanation might well have cast some doubt upon the police narrative of these events. See *State v. Long*, 195 Or 81, 244 P2d 1033 (1952).

In addition, we fail to see wherein the challenged testimony aroused any prejudice in the minds of the jurors. Nothing in this testimony indicates or even suggests that the group of Negroes posed a threat to persons or property. They were not acting menacingly toward the police or civilians. The challenged testimony was offered to justify police actions, not to explain the presence of the 10 or 20 Negroes at the bus depot. Defendant's arguments are without merit.

## MOTION FOR DIRECTED VERDICT
(Assignment No. X)

Prior to final arguments defendant moved for a directed verdict of not guilty. He assigns as error the court's denial of that motion.

In passing upon a denial of this motion, this court reviews the evidence in the light most favorable to the state and will sustain the denial if there is any substantial evidence to support the verdict. *State v. Livingston,* 2 Or App 587, 469 P2d 632 (1970); *State v. Shipman,* 2 Or App 359, 468 P2d 921 (1970). Defendant was charged with armed robbery. Summarized briefly, the evidence produced tends to prove that one Michael Mostyn was robbed at pistol point of a leather jacket and some $2.80 in cash by two Negro males. Several Negroes were observed boarding a bus bound for Seattle shortly after the robbery. A man fitting the description of the robber holding the pistol was arrested by Seattle police when he stepped from the bus. He was wearing two leather jackets, one of which was positively identified by the victim as the jacket stolen from him. Also discovered in his possession was a revolver. This evidence was sufficient to submit to the jury the issue of defendant's guilt or innocence.

Though there may be a dispute over the facts the jury is the sole trier of those facts and any dispute must be resolved by it. Oregon Constitution, Art VII (Amended), § 3; *State v. Shipman,* supra. Circumstantial evidence alone is sufficient to establish any necessary element of a crime. *State v. Hanna,* 1 Or App 110, 459 P2d 564 (1969).

## INSTRUCTION ON WEAKER AND LESS SATISFACTORY EVIDENCE
### (Assignment No. XI)

██ Defendant contends that the court erred in giving the following instruction to the jury:

"* * * Evidence is to be estimated not only by its own intrinsic weight, but also according to

the evidence which it is in the power of one side to produce and the other side to contradict. Therefore, if weaker and less satisfactory evidence is offered, when it appeared that stronger and more satisfactory evidence was within the power of the party to produce, the evidence offered should be viewed by you with distrust."

Defendant excepted to the instruction on the ground that, where the court fails to make it clear that such instruction applies only to the state, it improperly places upon defendant a burden of proof which he does not in fact have. Here defendant testified and presented other witnesses on his behalf. In that situation the instruction is merely abstract. See *State v. Kniss*, 253 Or 450, 455 P2d 177 (1969); *State v. Gwyther*, 4 Or App 473, 479 P2d 248, Sup Ct *review denied* (1971).

The trial court also clearly instructed the jury that the state had the burden of proving defendant's guilt beyond a reasonable doubt, that the burden of proof remained at all times upon the state, and that defendant was required to prove or disprove nothing. The challenged instruction was not prejudicial and did not deprive defendant of a fair trial. *State v. Kniss*, supra; *State v. Gwyther*, supra.

Affirmed.