## COMMONWEALTH *vs.* JOHN FLANAGAN.

Norfolk. June 11, 1985. — July 29, 1985.

Present: ARMSTRONG, DREBEN, & SMITH, JJ.

*Evidence,* Relevancy and materiality, Nonexistence of evidence, Cross-examination. *Error,* Harmless.

Although it was error for the judge at the trial of a criminal case to exclude a question, asked by defense counsel in cross-examining a police detective, as to why only the victim had been asked to view a lineup and not other witnesses as well, the error was harmless, where the anticipated answer to the question was that the principal reason for conducting the lineup was to preserve an in-person identification of the defendant by the elderly victim, who might not be available to testify at trial, and where exclusion of the question enabled defense counsel to argue that failure to have the other witnesses view the lineup might have been based on apprehension by the police that the other witnesses might not be able to identify the defendant. [475-477]

Although the judge at the trial of a criminal case erred in permitting the prosecutor to pose four questions to the defendant asking whether various Commonwealth witnesses were "mistaken" when they offered testimony which conflicted with his, in the circumstances the error was harmless. [477-478]

INDICTMENTS found and returned in the Superior Court Department on October 31, 1983.

The cases were tried before *Andrew Gill Meyer*, J.

*Brownlow M. Speer*, Committee for Public Counsel Services, for the defendant.

*Peter W. Agnes, Jr.*, Assistant District Attorney, for the Commonwealth.

ARMSTRONG, J. The defendant appeals from his April, 1984, convictions of unlawful possession of a shotgun, armed burglary, and armed assault in a dwelling. At trial, the defendant contended that the elderly victim and other witnesses mistakenly identified him as the assailant. He raises two issues on·

appeal. On both of these issues we agree with the defendant that there was error but conclude that the errors, in the circumstances, were harmless.

The identification evidence adduced by the Commonwealth was as follows: Christopher Murphy and Timothy Forkin were working at the Ro-Jo's gas station on Route 1 in Norwood on the evening of August 18, 1983. An Oldsmobile Cutlass automobile pulled into the station at approximately 8:00 P.M. The driver (whom they identified at trial as the defendant) emerged from the Cutlass; he was between five feet seven and five feet eight inches tall, and wore a green sweatshirt or jacket, jeans, and a blue and white baseball cap. He walked over to a "foreign car" parked nearby and talked with its two occupants. He returned alone to the Cutlass, where his passenger had remained, and they soon removed from its trunk a long, pink cardboard box and a six-pack of beer. After spending some time at the auto store at Ro-Jo's, the driver of the Cutlass, still carrying the pink box, walked to the foreign car and drove off with its occupants. The passenger drove off in the Cutlass. The incident lasted fifteen to twenty minutes.

Laura Taylor, an eighty-eight year old widow, lived on Neponset Street in Norwood. Some time after 8:00 P.M. that same evening, she heard a noise and saw a man, armed with a shotgun, standing in her bedroom doorway. The man (at trial, she testified that the defendant "looks something like" him) wore a mask, his cap was pulled down over his forehead, and his jacket collar was upturned. She believed he was five feet eight inches tall, but she could see only his eyes and mouth. He held the shotgun to her head while a second intruder rummaged through her bureau and then took a stereo. After the second intruder yelled to someone outside to drive up to the front door, the two left the house. The robbery lasted about ten minutes.

Raymond Daniels, who lived across the street from Taylor, was working in his garage that evening. Daniels saw a person leave the Taylor house carrying something the size of a stereo. The person approached a parked car beside which another person was standing; the two entered the car and drove off.

Concerned, Daniels crossed the street and, at the Taylor drive-way, encountered another man coming out of the house. Daniels could not see his face, but did note that he was five feet seven or five feet eight inches tall, was carrying a shotgun, and wore dark glasses, a sweatshirt, and a blue and white baseball cap. After Daniels confronted him, the man ran away toward the dead end of Old Neponset Street.

Mark Goldstone was working at the Old Colony gas station in Norwood that evening. At around 9:00 P.M., he saw a man (whom he identified at trial as the defendant) coming toward the station from a dirt road which led to Old Neponset Street. The man, who had scratches on his face, was five feet seven inches tall, wore dungarees and a green sweatshirt, and was carrying a blue and white baseball cap. He made a number of phone calls while at the station, and he told Goldstone that the police were looking for him. He later asked Goldstone if he minded if he removed his clothes. Goldstone said he didn't mind, and the man removed his sweatshirt, revealing a tattooed left arm. He placed the cap and the sweatshirt next to the building and ran off. He had been at the station for forty-five minutes.

Later that evening, at around 11:00 P.M., the defendant arrived at the Dedham house of correction. There he talked with deputy sheriff Michael Cabana, whom he had known for years. The defendant's face and hands had "fresh" scratches, which the defendant attributed to a fight with his brother.

In their investigation, the police found a pink cardboard box behind the Taylor house, a shotgun on Neponset Street (in the direction of the dirt road between Old Neponset Street and the Old Colony station), and the abandoned cap and sweatshirt (which contained a pair of sunglasses) at the Old Colony station. The police conducted fingerprint tests on the shotgun, the sunglasses, and the telephone at the Old Colony station. The prints from the sunglasses and shotgun and one print from the telephone were too incomplete for comparison analysis, and another telephone print did not match the defendant's. Detective Michael Broyer testified that attempts to lift prints from the Old Colony station itself were unsuccessful due to "moisture conditions."

Murphy and Forkin (the Ro-Jo's employees) identified as the defendant's the pink cardboard box found at the victim's house and the clothes abandoned at the Old Colony station. Detective Broyer showed Murphy, Forkin, Taylor (the victim) and Goldstone (the Old Colony employee) two separate photo arrays which included the defendant, one array in color and the other black and white. Murphy identified the defendant from both arrays. The other three identified the defendant only from the color array. Taylor failed to identify the defendant at a lineup conducted by Detective Broyer, which the other three did not view. Daniels (Taylor's neighbor) viewed the color array but could not identify the defendant. At trial, both Goldstone and Cabana (the deputy sheriff) correctly identified a photo of a tattooed arm as that of the defendant.

1. On cross-examination of Detective Broyer (who conducted the photo array viewings and the lineup), defense counsel asked why only Taylor had been asked to view the lineup, and not Murphy, Forkin, and Goldstone as well. The prosecutor objected to the question, and, after a bench conference, the judge excluded it. We think this ruling was erroneous.

It is settled that a defendant has a right to ask investigating police officers whether they employed particular tests or procedures, such as a fingerprint test or a lineup. *Commonwealth v. Pettie*, 363 Mass. 836, 839-842 (1973). *Commonwealth v. Rodriguez*, 378 Mass. 296, 308 (1979). *Commonwealth v. Bowden*, 379 Mass. 472, 485-486 (1980). *Commonwealth v. Benoit*, 382 Mass. 210, 221 (1981). The relevance of such inquiry is not immediately obvious. The fact that the police did not conduct a test has by itself little or no tendency to show the defendant's guilt or innocence.[1] The relevance of such testimony appears to lie in the reason why a test was omitted. In the *Pettie* and *Bowden* cases, the defendants argued that the failure to test was due to police bias against them. Any such bias would be relevant with respect to the credibility

---

[1] This was the sense of the trial judge's pointed (but erroneous) ruling in the *Bowden* case (379 Mass. at 485) "that no evidence is exactly that. No evidence . . . ."

of the officers' testimony, and it would cast suspicion on evidence offered by the police. In the *Rodriguez* and *Benoit* cases, the defendants attacked the reliability of tests which were performed by asking officers whether other, more reliable tests had also been performed. In addition to undermining the weight of the test results put in evidence, these inquiries were also directed towards showing that the investigations were sloppy, thereby raising doubts about the integrity of the offered evidence and the exhaustiveness of the investigations as a whole. It is for those reasons that "[t]he failure of the authorities to conduct certain tests or produce certain evidence [is held to be] a permissible ground on which to build a defense . . . ." *Commonwealth* v. *Bowden*, 379 Mass. at 485-486. Since it is the reason for investigative omissions, rather than the mere fact of such omissions, which is relevant to the jury's evaluation of the Commonwealth's evidence, it follows that questions directly probing the reason for a failure to test are themselves relevant and within the proper scope of cross-examination.[2]

---

[2] To prevent the jury from reaching unwarranted inferences concerning a failure to test, the prosecution should also be allowed to elicit on direct or redirect examination the reason for the omission of a test, such as that the test could not be performed (e.g., Broyer's testimony that prints could not be lifted from the Old Colony station due to "moisture conditions"), *Commonwealth* v. *Gallison*, 384 Mass. 184, 196-197 (1981), or would have had little probative value, *Commonwealth* v. *Baker*, *post* 926, 927-928 (1985). Compare *Commonwealth* v. *Walker*, 14 Mass. App. Ct. 544, 548-549 (1982). See also *State* v. *Dixon*, 5 Or. App. 113, 129-130 (1971). However, such questioning, going to the subjective reasons for omission to test, should be approached with caution, lest it be made the vehicle for an improper expression of the officer's opinion as to the need for such testimony in light of the strength of the case against the defendant. An officer's personal evaluation of the weight of the evidence, like that of a prosecutor, is irrelevant, unless it reveals bias against the defendant. *Alexander* v. *Commonwealth*, 450 S.W.2d 808, 810-811 (Ky. App. 1970). Cf. *United States* v. *Williams*, 529 F. Supp. 1085, 1105 (E.D.N.Y. 1981), aff'd, 705 F.2d 603 (2d Cir.), cert. denied, 464 U.S. 1007 (1983); *Johnson* v. *State*, 23 Md. App. 131, 139-140 (1974). Compare *Commonwealth* v. *Smith*, 387 Mass. 900, 906 (1983); *Commonwealth* v. *Bourgeois*, 391 Mass. 869, 878 (1984). A judge confronted with unusual inquiry along those lines may be well advised to hold a bench conference or possibly a voir dire to ascertain in advance the information sought to be elicited.

Nevertheless, any error was harmless in the circumstances of this case. Although counsel on cross-examination is not obligated to make an offer of proof; see Liacos, Massachusetts Evidence 78-79 (5th ed. 1981), *Commonwealth* v. *Piedra, ante* 155, 158 n.3 (1985), defense counsel during the bench conference indicated the testimony he anticipated from Detective Broyer. Relying on Broyer's grand jury testimony, defense counsel expected Broyer to testify that the district attorney's office had instructed him to conduct a lineup only for Taylor and that the principal reason for the lineup was to preserve an in-person identification of the defendant by an elderly woman who might not be available to testify at trial. This testimony could have been of no help to the defense, since it would not have supported an inference of bias against the defendant or sloppiness in the investigation. The defendant was, if anything, aided by the exclusion, as his counsel went on to argue to the jury that the failure to have the other identifying witnesses view the lineup might have been based on apprehension by the police that the other witnesses might not be able to identify the defendant in person.

2. The defendant objected to what were, in essence, four questions[3] posed by the prosecutor to the defendant, asking him whether various Commonwealth witnesses were "mistaken" when they offered testimony which conflicted with his. The defendant contends, correctly, that the questions were improper under *Commonwealth* v. *Dickinson*, 394 Mass. 702, 706 (1985), *Commonwealth* v. *Ward*, 15 Mass. App. Ct. 400 (1983), and *Commonwealth* v. *Long*, 17 Mass. App. Ct. 707 (1984), because in the context of this cross-examination there was no meaningful distinction between asking a witness whether another witness was "lying" and asking him whether the witness was "mistaken." Compare *Commonwealth* v. *Long,*

---

[3] Defense counsel did not object at trial to the first such question but entered objections to the following three. Due to bench conferences and objections, the fourth question, about whether certain facial scratches were "fresh" or not, was repeated three times, and the prosecutor asked a fourth time whether the "mistake" about the scratches was similar to the previous three "mistakes" by Commonwealth witnesses.

17 Mass. App. Ct. at 708-710. Contrast *Commonwealth* v. *Collett,* 17 Mass. App. Ct. 913, 914 (1983). See also *Commonwealth* v. *Liebman,* 379 Mass. 671, 678 (1980). It is generally improper to "tempt the defendant to comment on inconsistencies between his testimony and that of the other witnesses," *Commonwealth* v. *Long,* 17 Mass. App. Ct. at 708, and a series of such questions tends to divert the focus of the witness's testimony away from facts to an improper assessment, in the nature of opinion evidence, concerning the credibility of other witnesses and the weight to be accorded to their testimony. See *Olson* v. *Ela,* 8 Mass. App. Ct. 165, 169 (1979); *Commonwealth* v. *Ward,* 15 Mass. App. Ct. at 401-402.

Although the questions were improper, we find no prejudicial error. Unlike *Commonwealth* v. *Long, supra,* in this case few such questions were asked. Compare *Commonwealth* v. *Dickinson,* 394 Mass. at 706. *Commonwealth* v. *Ward, supra*; *Commonwealth* v. *Collett,* 17 Mass. App. Ct. at 914; *Commonwealth* v. *Brimley,* 19 Mass. Ct. 978, 979 (1985).

The contention that the prosecutor unduly emphasized these questions during his closing argument is not borne out by the record. When the prosecutor rhetorically asked the jury to consider whether "everybody else [other than the defendant] is mistaken," she was referring, not to the defendant's answers to the improper questions, but rather to defense counsel's closing argument immediately preceding, at which defense counsel argued repeatedly (and forcefully) that the Commonwealth's witnesses had made mistakes in identification.

*Judgments affirmed.*