Commonwealth *vs.* Anthony Pagano.

No. 98-P-1477.

Middlesex. January 20, 1999. - June 3, 1999.

Present: Greenberg, Gillerman, & Rapoza, JJ.

*Practice, Criminal,* Cross-examination by prosecutor, Failure to make objection, Argument by prosecutor. *Evidence,* Expert opinion, Voice identification. *Identification.*

No substantial risk of a miscarriage of justice arose at a criminal trial by reason of the prosecutor's questions of the defendant on cross-examination, and any isolated improper questions were not prejudicial. [57-60]

At the trial of a criminal case, the prosecutor's improper remarks in closing argument that, inter alia, misstated the law with respect to the presumption of innocence, characterized himself as the "thirteenth juror," and referred to his experience as an altar boy, which the defendant objected to and which went to the heart of the issues tried, would not, in the circumstances of the evidence presented and the instructions given, have made a difference in the jury's conclusions. [60-64]

At the trial of an indictment for armed robbery while masked, the judge did not abuse his discretion in excluding expert testimony proffered by the defendant concerning voice identifications. [64-65]

Indictment found and returned in the Superior Court Department on October 10, 1996.

The case was tried before *Charles T. Spurlock,* J.

*David J. Nathanson* for the defendant.

*Douglas E. Zemel,* Assistant District Attorney, for the Commonwealth.

Greenberg, J. A Superior Court jury convicted the defendant of armed robbery while masked (G. L. c. 265, § 17). The robbery in question, of an employee of a PetroPlus gas station in Malden, occurred on the night of September 9, 1996, inside the station's convenience store where the cash register was. The defenses were misidentification and alibi.

According to the evidence presented at trial, Karim Slaoui,

the employee and only percipient witness, saw someone walking around the gas pumps looking toward the store. It was about 10:00 P.M. The man stood about ten to fifteen feet away. From his vantage point inside the store, Slaoui could see that the man wore a black ski mask over his face. As he was about to leave the store to warn other attendants at the pumps, a second man came inside and stuck a gun against Slaoui's stomach. He also wore a mask so that Slaoui could only make out his eyes. The robber exclaimed, "Give me the money," repeating the demand several times. Despite the mask, Slaoui discerned a peculiar "bluish" hue to the robber's eyes. He kept listening to the robber's voice and recognized him as a regular customer whom he knew as "Eric Wright," which also was the name of a well known rap singer. When he referred to the masked man as "Eric," the robber responded, "My name is not Eric, just give me the money." With some reluctance, Slaoui edged closer to the register. By this time, the robber looked exasperated enough to pull the trigger; Slaoui opened the register and pushed the silent alarm. The robber grabbed the money and walked out of the store. The whole encounter lasted about a minute or two.

Malden police responded to the call with alacrity, but the robbers were gone. Other employees were unaware of the robbery. Slaoui described the robber as a white male by the name of Eric Wright who was a regular customer of the station. Several days later, Slaoui went to the Malden police station to look at some photographic identification books. He gave Detective Eugene Walsh details of the robbery and physical descriptions of the robber and the second man who was acting as a lookout. Eventually he identified a picture of the accomplice and two pictures of men that he recognized as friends of the robber. Slaoui was unable to identify any photograph depicting the robber.

Even though the robber had frequently purchased cigarettes at the station before the robbery, according to Slaoui, he stopped coming subsequent to the robbery. Slauoi told Al Brito, the mechanic at the station, about what had happened and that this was not the first time he had seen the regular customer at the station. On September 19, 1996, ten days after the event, Slaoui was at work again inside the store when Brito burst inside and said he had seen "Eric Wright" walking on the opposite side of the street. Clad in a white tee shirt, he was covering part of his face with a dark-colored cloth shirt. Brito pointed toward the

man to see if Slauoi could identify him as the robber, and the police were summoned.

Detective Walsh and his partner were just coming from Lynn when he overheard a radio dispatch. The officers drove to the area of the gas station where they learned from another police officer that the robbery suspect had been seen in the locale. A quick drive around the neighborhood proved futile. Next, they began to search inside several houses close to the station and eventually came upon the defendant, who was hiding behind a boiler in the cellar of a house at 17 Richardson Street.

When the police questioned him, he said he was visiting his girlfriend who lived in an adjacent apartment building. Slaoui was brought to the scene and identified the defendant as the robber, saying, "That's him; I'll never forget his eyes or his voice." There was no other circumstantial evidence linking the defendant to the crime. It boiled down to a question of the reliability of Slauoi's identification.

The defendant testified and denied his involvement in the robbery. However, he did admit that he knew Slaoui and had been a customer of the store before the robbery. He acknowledged that Slaoui knew him as Eric Wright. As an explanation for his odd behavior on the evening of his arrest, he testified that he had come from a tanning salon, headed toward his girlfriend's place a few blocks away, when he ran into a friend. They hid behind the house at 17 Richardson Street to smoke some marijuana only to spot a police cruiser pulling up in the front of the house. He ran into the basement out of fear of arrest. To buttress his defense, Donna DiPrisco, his girlfriend's mother, testified that the defendant had been present at her home on September 9, 1996, between 5:30 P.M. and 10:00 P.M.

On appeal the defendant claims (1) the prosecutor engaged in improper cross-examination; (2) the prosecutor in his closing argument made improper and prejudicial statements concerning the defendant, used burden-shifting language, and unfairly maligned his character; and (3) the denial of his counsel's request to present expert testimony on voice identification constitutes prejudicial error.

1. *Cross-examination of the defendant.* The defendant testified on direct examination that his nickname, "Eric Wright," was that of a "rapper" and that Slaoui knew him by that name. As the prosecutor was winding up a lengthy cross-examination of the defendant, he launched into an unnecessarily inflamma-

tory line of questions. That portion of the cross-examination is set forth in the margin.[1]

On appeal, the defendant argues that the prosecutor's cross-examination was designed to link him with gangster rap, murder, and robbery and that such a tactic amounted to an unjustified attack on his character. Cf. *Commonwealth v. McClendon*, 39 Mass. App. Ct. 122, 129-130, 132 (1995) (cross-examination of the defendant portraying him as a violent, aggressive drunk who tended to commit unprovoked attacks when under the influence of alcohol was improper and unfairly prejudicial). The defendant contends that the suggestions made by the prosecutor concerning gangster rap, AIDS, murder of the police, firearms, and wearing a mask were calculated to bias the jury against him. Aliases and associations to gangs, such as the questions regard-

---

[1]

| PROSECUTOR: | "And Eric Wright is a rapper, you say, right?" |
|---|---|
| DEFENDANT: | "Yes." |
| PROSECUTOR: | "He's a gangster rapper, or least he was; isn't that right?" |
| DEFENDANT: | "Yeah." |
| PROSECUTOR: | "He died of AIDS back in 1995?" |
| DEFENDANT: | "Yes, sir." |
| PROSECUTOR: | "[H]e and Doctor Trau and all those people started NWA; isn't that right? And made gangster rap popular, isn't that right?" |
| DEFENDANT: | "Yes, they did. Yes, they did." |
| PROSECUTOR: | "And all his songs and all their songs talked about shooting police and having guns or robbing people —" |
| DEFENSE COUNSEL: | "Objection." |
| PROSECUTOR: | "Isn't that right?" |
| THE COURT: | "Sustained. The jury will disregard." |
| PROSECUTOR: | "Is Eric Wright the same Eric Wright that showed up on the Arsenio Hall show wearing a ski mask?" |
| DEFENSE COUNSEL: | "Objection." |
| THE COURT: | "Sustained." |

ing the band NWA,[2] can be suggestive of bad character and prior criminality and have the potential of causing a jury to improperly consider a defendant's criminal propensity. See *Commonwealth* v. *Wolcott*, 28 Mass. App. Ct. 200, 204-206, 210 (1990). The Commonwealth assures us that the purpose of these questions was not to suggest that the defendant had a gangster mentality but to call into question the defendant's credibility by showing that during the months prior to the robbery, the defendant — while "casing" the gas station — chose to use as a pseudonym the name of a person who advocated breaking the law. That argument is less than convincing.

However, even if the prosecutor crossed the line by "[a]sk-[ing] [a] question that he ha[d] no reasonable basis to believe is relevant to the case and that is intended to degrade a witness," see *Commonwealth* v. *DeMars*, 42 Mass. App. Ct. 788, 794 (1997), quoting from Supreme Judicial Court Rule 3:07, Canon 7, DR 7-106, as appearing in 382 Mass. 787 (1981), *S.C.*, 426 Mass. 1008 (1998), the point was not properly preserved for appeal. Of the five questions asked containing material now claimed offensive, defense counsel objected only to the last two. Those objections were not timely with respect to the earlier questions. See *Commonwealth* v. *Silvia*, 343 Mass. 130, 135-136 (1961) ("[Objections] must be taken to evidence when it is offered"); *Commonwealth* v. *Hinckley*, 1 Mass. App. Ct. 195, 199 (1973) (objection to a "line of questioning" after questioning was concluded was not timely). When defense counsel finally did object, the objections were sustained and the judge told the jury to "disregard" at least one of the questions. Defense counsel did not, at the conclusion of this part of the cross-examination, move to strike all of the questions or answers that may have been objectionable. Such a failure to make a timely objection or motion to strike precludes appellate review as a matter of right except to determine whether there is a substantial risk of a miscarriage of justice. *Commonwealth* v. *Comtois*, 399 Mass. 668, 674 (1987). See Liacos, Massachusetts Evidence § 3.8.4 (6th ed. 1994).

In another portion of his cross-examination of the defendant, the prosecutor asked him, "You don't have any idea why [Slaoui] would have reason to come into this courtroom and lie,

---

[2]NWA, a musical band, were known for their gangster rap music that was "provocative and hard-core 'to the extreme.' " *Hutchinson* v. *Essence Communications, Inc.*, 769 F. Supp. 541, 561 (S.D.N.Y. 1991).

isn't that right?" Defense counsel lodged an objection, which the judge overruled. This was error. A witness may not be asked to comment on the credibility of another witness. *Commonwealth* v. *Triplett*, 398 Mass. 561, 566-567 (1986). *Commonwealth* v. *Ward*, 15 Mass. App. Ct. 400, 401-402 (1983). See *Commonwealth* v. *Barros*, 5 Mass. App. Ct. 887 (1977). The evidence in this case boiled down to a duel of credibility between Slaoui and the defendant, and ordinarily the prejudicial effect of the improper question would have required reversal. Contrast *Commonwealth* v. *Long*, 17 Mass. App. Ct. 707, 707-710 (1984) (a long series of improper questions of this type warranted reversal). Unlike the *Long* case, however, here only one question of this type was asked. Compare *Commonwealth* v. *Flanagan*, 20 Mass. App. Ct. 472, 478 (1985). The prosecutor should have refrained from asking it. However, he did not harp on the issue in his closing. The thrust of the defendant's direct testimony, in which he denied his participation in the robbery, was not directly affected by the prosecutor's mistake. The defense was one of mistaken identity. And there was no evidence of animus between Slaoui and the defendant. Therefore, the prosecutor's improper question was harmless. *Commonwealth* v. *Rosado*, 428 Mass. 76, 79-81 (1998) (an "error is not prejudicial only if the Commonwealth can show 'with fair assurance . . . that the judgment was not substantially swayed' by it").

Similar principles govern the defendant's claim that the prosecutor injected improper insinuation in evidence when he asked the defendant, "Mrs. DiPrisco just testified she appeared here only because your father kept calling her to get her in here, isn't that right?" In fact, the witness had not so testified. There was no objection. The defendant answered, "No, sir." Again, this was an isolated instance, and any harm to the defendant was negligible.

2. *Prosecutor's closing argument.* Defense counsel, during his cross-examination of Slaoui, questioned him about inconsistencies between his trial testimony and what he told the grand jury, to bring out that his identification of the defendant as the perpetrator was mistaken. The prosecutor, in his closing argument, responded: "[Defense counsel] brought up the pretrial hearing we had in June. Nine months later, it is still the defendant. He testified yesterday, and it's still the defendant who was the robber. As it goes down, you will be the Anthony Pagano jury. I will be the Anthony Pagano prosecutor today,

two days from now, a year from now, and [defense counsel] can't disturb that. That's what the truth is. It has that staying power." On appeal the defendant contends that this remark, which was objected to at trial, was a foul blow because it incorrectly suggested that the jury could consider the consequences of their verdict. See *Commonwealth* v. *Burke*, 373 Mass. 569, 576 n.3 (1977); *Commonwealth* v. *Thomas*, 401 Mass. 109, 117 (1987). It seems to us extremely unlikely that a jury would be led by that remark to an invidious reflection about their being "the conscience of the community." See *Commonwealth* v. *Mathews*, 31 Mass. App. Ct. 564, 572-573 (1991), cert. denied, 504 U.S. 922 (1992).

The defendant also argues this remark diminished the responsibility of the jury by implying that, even if they acquitted him, he would eventually be prosecuted on other charges. The Commonwealth contends, however, that the purpose of this remark at the end of the closing was to respond to the defense counsel's attack on the victim's perceptions, by informing the jurors that throughout every stage of the case the victim, Slaoui, had been very consistent that the person who committed the robbery was the man he knew as "Eric Wright." Although this explanation is somewhat opaque, taking the prosecutor's remarks as on the wrong side of the line, we conclude that in the circumstances the remark probably did not harm the defendant and implied only that the victim's version of the events had not really changed.

More troubling, we think, was the prosecutor's remark at the start of his closing argument. He said, "To me this is probably one of my favorite times of the trial. . . . [D]o you remember when we first began the trial, the judge talked about a legal concept called the presumption of innocence? But now as we come to the end of this trial, that presumption of innocence, which I sometimes characterize as somebody wearing a cloak, and that's how he's protected, by wearing that cloak, but now that cloak comes off. And now you people get to judge. You guys get to decide the facts in this case. For me, this is where it gets good." Defense counsel objected, and the judge sustained the objection. A subsequent defense motion for a mistrial on the basis of these remarks was denied. The judge, in his charge to the jury, gave the traditional admonition that closing arguments are not evidence.

The prosecutor's statement would not have been incorrect

had he said that "the presumption of innocence . . . creates for every [d]efendant a cloak, a covering, a protection . . . unless and until evidence is presented . . . which would convince [the jury] beyond a reasonable doubt that the presumption . . . is nonexistent." See *Commonwealth* v. *Sheline*, 391 Mass. 279, 293-294 n.4 (1984). Here, however, the prosecutor, instead of saying in clear terms where the burden of proof lay, mangled the "classical statement that the presumption of innocence continues throughout the case." *Commonwealth* v. *Kane*, 19 Mass. App. Ct. 129, 139 (1984). By emphasizing that at the end of the trial the "cloak comes off" the prosecutor may have suggested the defendant had some burden to prove his innocence. It is constitutionally impermissible to shift the burden of proving an element of the crime to the defendant. Compare *Commonwealth* v. *Thomas*, 401 Mass. 109, 112-113 (1987) ("[l]awyers . . . must not misstate principles of law nor may their summations infringe or denigrate constitutional rights").

Later in his closing, the prosecutor committed another lapse by saying, "If I haven't proven this case beyond a reasonable doubt, then let my vote be the thirteenth for not guilty." Defense counsel objected and, on appeal, argues that the remark "creates the false issue of the reliability and credibility of counsel," especially where the prosecutor possesses "the advantage of official backing." *Commonwealth* v. *Smith*, 387 Mass. 900, 906 (1983), quoting from *Commonwealth* v. *DeChristoforo*, 360 Mass. 531, 547 (1971) (Tauro, C.J., dissenting). By characterizing himself as the "thirteenth juror," the prosecutor came perilously close to vouching for his version of the evidence. See *Commonwealth* v. *Marquetty*, 416 Mass. 445, 450-451 (1993) ("counsel must be careful to avoid misstating principles of law, infringing or denigrating constitutional rights, and provoking undue sympathy or bias"). The argument was improper. Both of these remarks "adversely implicate the defendant's fundamental right to be presumed innocent." *Commonwealth* v. *Thomas*, 401 Mass. at 113, 114-116. The prosecutor further compounded the problem by referring to his experience as an altar boy. "When I was younger, my mom would volunteer me for a lot of things. One of the things she would volunteer for was when I was an altar boy was to do the seven o'clock Mass. Father Cleary did the seven o'clock Mass, and I was so thankful when he finally changed from Latin to English, so I could understand what he was talking about. He would end every simple homily this way:

he would say, 'Think about it, pray about it, and hopefully you'll do something about it.' Now, there is no prayer involved in what you have to do, but you think about all the evidence you heard. You talk about it when you go back there, and hopefully you'll do something about it."

There were other prosecutorial excesses in the closing argument which were less serious than those already mentioned. The ultimate question, however, whether in the circumstances these utterances deprived the defendant of a fair trial and require reversal, turns on the particulars of the individual case. See *Commonwealth* v. *Kozec*, 399 Mass. 514, 518 (1987), which outlines four factors to apply to evaluate the question: (1) Did the defendant seasonably object? (2) Was the prosecutor's error limited to collateral issues or did it go to the "heart of the case"? (3) Did the judge give any curative instructions that generally or specifically mitigated the prosecutor's error? (4) Did the prosecutorial error or errors, in sum, possibly make a difference in the jury's conclusions? We agree with the defendant that two of the factors favor the defendant's side. We note that defense counsel seasonably objected to nearly all of the prosecutor's transgressions, and that two of the worst ones — his remarks about the burden of proof and his vouching for the credibility of the prosecution — were not "collateral" and went "to the . . . heart of the case." *Commonwealth* v. *Shelley*, 374 Mass. 466, 470-471 (1978). As to the third factor, the judge's general instructions to the jury correctly set out the principles relating to the presumption of innocence and the burden of proof, although the judge's response to the most inflammatory part of the closing was perfunctory.

On the fourth factor — "generally did the error in the circumstances possibly make a difference in the jury's conclusions?" (*Commonwealth* v. *Kozec, supra*) — we part company with the defendant. Slaoui's identification evidence at this trial, although not incontrovertible, made a potent case for conviction. Unlike most identification cases, his testimony had solid predicates. He had had prior contact with the defendant, was able to recall with some degree of particularity his salient features, and recounted them in detail. It is hard to think that the jury were likely to be swayed by either the inept parts of the cross-examination or the excessive rhetoric contained in the closing. The prosecutor's worst trespass in closing was a misstatement of the law, but it is the judge who instructs the jury

on the law, not counsel in argument. The whole point of Slauoi's testimony — not diminished by cross-examination — was that he had had a fair opportunity to observe the defendant in the store and that he recognized him, even masked, as a frequent customer.

3. *Exclusion of defendant's expert testimony.* During trial, the defendant sought permission from the judge to present an expert witness on voice identification, Dr. Alexander D. Yarmey. In his offer of proof, trial counsel stated that he intended to show that identifications based on voice contacts of short duration have a high potential for inaccuracy. *Commonwealth* v. *DeMaria*, 46 Mass. App. Ct. 114, 117 (1999), citing *Commonwealth* v. *Marini*, 375 Mass. 510, 516-517 (1978). The judge expressed skepticism. He foreclosed the proof, stating that the reliability of Slaoui's voice identification was within the scope of ordinary experience. The matter is properly before us on timely objection by trial counsel.

Voice identification may be a proper subject for expert testimony. However, in such cases, expert testimony is not admissible as of right, and trial judges are given broad discretion. The question is whether expert testimony "would have been of assistance to the jury." *Commonwealth* v. *Francis*, 390 Mass. 89, 98-101 (1983). *Commonwealth* v. *Hyatt*, 419 Mass. 815, 818 (1995). In *Commonwealth* v. *Santoli*, 424 Mass. 837, 838-840 (1997), a rape case decided after the trial in the instant case, the traumatic events that gave rise to the victim's identification created a higher risk of mistake than appears in the instant case. Even so, the court rejected the argument that the judge abused his discretion in excluding expert testimony concerning eyewitness identification in that case. *Id.* at 841-843. The *Santoli* court commented on the relatively small number of instances where exclusion of this kind of testimony amounts to an abuse of discretion. *Id.* at 842. Much depends on the strength of identification, the period of time that transpires between the occurrence of the crime and the identification, the corroborating factors, and the opportunity of the victim to observe and identify the defendant as the offender.

In the circumstances of this case, which include a very perceptive victim-witness, a reasonably prompt identification, and prior experience of the victim with the defendant, we cannot say that there are "peculiar facts," see *State* v. *Chapple*, 135 Ariz. 281, 285, 293-297 (1983), that require expert

testimony on an issue which the judge thought unnecessary. Unlike the situation in *Commonwealth* v. *Smythe*, 23 Mass. App. Ct. 348, 352-353, 355 (1987), where the judge summarily dismissed the defendant's offer of proof concerning expert testimony on the breathalyzer machine, the judge here noted his reasons on the record for excluding the evidence, e.g., that the proffered testimony was within the common knowledge of the jury and would not assist them in deciding the case.

4. The defendant's final argument that the cumulative effects of the two alleged errors created a substantial risk of a miscarriage of justice is without merit. We have examined the entire record and are aware that the jury deliberated just over two days. We conclude, however, that the errors were not "sufficiently significant in the context of the trial to make plausible an inference that the result might have been otherwise but for the error." *Commonwealth* v. *Almon*, 30 Mass. App. Ct. 721, 725 (1991), quoting from *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 21 (1986).

*Judgment affirmed.*