IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 81212-2-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| ALEJANDRO PEÑA SALVADOR, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

HAZELRIGG, J. — Alejandro Peña Salvador seeks reversal of his convictions for one count of child molestation in the first degree, two counts of rape of a child in the second degree, and one count of child molestation in the third degree. He contends that the trial court erred in denying his request to excuse a prospective juror for cause, resulting in the seating of a biased juror. Because Peña Salvador has not shown that the juror expressed actual bias, we affirm the jury verdict.

Peña Salvador also challenges three of the conditions of community custody imposed by the court and requests that a scrivener's error in the judgment and sentence be corrected on remand. We accept the State's concessions that the trial court mistakenly failed to consider Peña Salvador's constitutional right to parent his biological children when prohibiting contact with any minors and that the judgment and sentence contains a scrivener's error. We remand for reconsideration of the condition prohibiting contact with any minors in light of Peña

Salvador's right to parent his biological children, to strike the condition requiring payment of the supervision fees, and to correct the scrivener's error in the judgment and sentence.

FACTS

Alejandro Peña Salvador started dating Maria C. in 2009. Maria had three daughters: L.O., born in 1999, J.O., born in 2001, and K.O., born in 2006. Peña Salvador had a son around K.O.'s age who lived in Mexico. Peña Salvador soon moved in with Maria and her daughters. He and Maria had a son, K.P., in 2013.

In April 2015, when L.O. was 16 years old, she disclosed to a counselor that Peña Salvador had touched her inappropriately when she was 13 or 14 years old. The counselor contacted Child Protective Services (CPS), who referred the case to police. The investigating detective was not able to make contact with L.O. or Maria, and the case was inactivated.

In February 2018, J.O. disclosed to a counselor that Peña Salvador had sexually abused her repeatedly, starting when she was nine or ten years old. The counselor contacted the police, and Peña Salvador was arrested. During the investigation of J.O.'s allegations, a detective also spoke with L.O. about the disclosure she had made in 2015. As to J.O., Peña Salvador was charged with one count of child molestation in the first degree for events occurring between March 2009 and March 2013 and two counts of rape of a child in the second degree for events occurring between March 2012 and March 2015. As to L.O., the State charged Peña Salvador with child molestation in the third degree for events occurring between March 2011 and March 2015.

At the beginning of jury selection, prospective jurors completed a questionnaire regarding the general subject matter of the case. Based on their answers, many of the jurors were called in for individual questioning. Juror 44 was one of the jurors questioned individually about his questionnaire responses. In response to a question asking if there was any reason that he would be unable to be fair and impartial to both sides in a case involving an accusation of sexual abuse of a child, he indicated that he was not sure that he could be impartial: "As a school bus driver, I think of the students as my kids and [grandkids]." Defense counsel asked if he had formed an opinion on Peña Salvador's guilt when he heard the charges, and Juror 44 said that he had not, but stated, "I don't know if I can be impartial, and that would be unfair to your client." He said that he "would like to think [he's] an impartial person" but referenced the unconscious bias video that had been shown to the venire and stated, "I believe in the system. I don't want this gentleman to have me have bias against him from the get-go." Defense counsel asked, "[A]re you telling me that you think that you would be biased against my client?" and the prospective juror responded, "I'm afraid I might be [ ] and I'm just being honest with you."

The prosecutor then asked what bias he was concerned about, and Juror 44 responded that he was worried that the nature of the charges would induce him to make an incorrect decision. The prospective juror was not sure how to answer the question of whether he would be able to presume the defendant innocent. He stated that he believed it was possible for children to both lie and tell the truth about such allegations, and was not sure that he could evaluate the credibility of

witnesses: "Sometimes I've had the wool pulled over my eyes by people I've trusted." He believed that he could follow the court's instructions on the law and on which evidence to consider. The prosecutor asked, "[I]s there anything, other than your regular interaction with children and family that would make you think that you would rush to judgment on a case like this?" and the juror responded, "No, because I believe in the system." Juror 44 had served on a jury before, and the prosecutor inquired about his understanding of the system:

> [PROSECUTOR]: But, like you said, you understand the process and what's necessary to sit on a jury and to keep an open mind throughout the course of trial?
>
> JUROR: Yes.
>
> [PROSECUTOR]: Is that something, even with the charges, that you think you could try to do?
>
> JUROR: Yes, I think I could.

Defense counsel proceeded to ask a number of follow-up questions:

> [DEFENSE COUNSEL]: . . . Sir, have you—after hearing the allegations—well, not—have you formed an opinion about whether or not you feel my client is guilty or innocent?
>
> JUROR: Oh, no, that's—that's why I'm afraid if my bias gets in. I don't want to especially go conviction style if I don't feel he's guilty of it. I don't want me, my possible—and I don't know where it sits. I don't want to make a mistake.
>
> [DEFENSE COUNSEL]: Do you think that you would give more weight to the victims, since you're around children and you interact with them all the time?
>
> JUROR: I'm more afraid of what evidence might be brought—
>
> [DEFENSE COUNSEL]: Out against—
>
> JUROR: —and it would be upsetting.

[DEFENSE COUNSEL]: Okay.

JUROR: But, no, I would—I would listen to both sides.

[DEFENSE COUNSEL]: But you do have a question in your mind whether or not you could be fair or impartial, does that still stand?

JUROR: I think so.

Defense counsel moved to exclude the prospective juror for cause. The court denied the motion, explaining, "[H]e doesn't want to make a mistake. The conscientiousness of this juror is exactly what we look for in a juror. He is concerned. He is aware of implicit bias and is conscientiously making efforts to keep that in check." The juror served on the jury and deliberated.

At trial, L.O. and J.O. both testified that Peña Salvador had touched them inappropriately on multiple occasions. L.O. testified that she had been called a liar when she reported Peña Salvador's behavior in 2015, so she avoided being interviewed by police and CPS because she did not want to talk about it anymore. J.O. testified that she had told a childhood friend in confidence about the abuse as it was happening but did not tell anyone else until 2018, when she became concerned that Peña Salvador might be abusing her younger sister, K.O. Peña Salvador testified in his own defense and denied the allegations. The jury found Peña Salvador guilty as charged. He was sentenced to a total of 240 months of confinement. Peña Salvador appealed.

ANALYSIS

I.    Biased Juror

Peña Salvador first contends that he did not receive a fair trial because the court denied his request to dismiss Juror 44 for cause, therefore allowing a biased juror to deliberate.

A.  Preservation

As a threshold issue, the State argues that Peña Salvador has waived review of this issue because he accepted the jury panel, which included Juror 44, without exhausting his peremptory challenges.  Peña Salvador disagrees, arguing that "[t]he only way to preserve an improperly denied 'for cause' challenge is to refrain from using a peremptory challenge and allow the juror to serve."

Throughout the 21st century, Washington courts largely adhered to the rule, articulated in State v. Stentz, that "[a] refusal to sustain challenges for proper cause, necessitating peremptory challenges on the part of the accused, will be considered on appeal as prejudicial where the accused has been compelled subsequently to exhaust all his peremptory challenges before the final selection of the jury."  30 Wash. 134, 143, 70 P. 241 (1902), abrogated by State v. Fire, 145 Wn.2d 152, 34 P.3d 1218 (2001)  In Stentz, the Washington Supreme Court determined that the trial court erred in denying a for-cause challenge to a potential juror who was later removed from the venire using the defendant's last peremptory challenge.  Id. at 137, 141.  Even though the court's error did not result in the seating of a biased juror, the court found that the error resulted in prejudice

because "the accused was deprived of one peremptory challenge to which he was by law entitled." Id. at 147.

This rule was reiterated in State v. Parnell, which involved a similar factual scenario. 77 Wn.2d 503, 507–08, 463 P.2d 134 (1969), abrogated by Fire, 145 Wn.2d 152. The court found that "[a]ny error involved in failing to grant the defendant's challenge for cause against venireman Martin was not obviated by the fact that he did not sit on the jury" because the defendant had to use one of her peremptory challenges, which she exhausted, to remove the biased juror. Id. at 508. The court reasoned that not only is every defendant "entitled to a fair trial before 12 unprejudiced and unbiased jurors," but "there should be no lingering doubt" about the fairness of the trial. Id.

In State v. Latham, the trial court denied for-cause challenges to two jurors, whom the defendant then excused using peremptory challenges. 100 Wn.2d 59, 63, 667 P.2d 56 (1983). Latham argued on appeal that "the denial of his challenges to Wright and Flagel was erroneous and forced him to use peremptory challenges that he could have used better on other jurors." Id. The Washington Supreme Court found that Latham had failed to show that the two jurors should have been excused for bias. Id. at 63–64. Although the court acknowledged that it "need not address" the issue of prejudice because it had found no error, it asserted that "the use of a peremptory challenge to remove a juror who should have been removed for cause 'cures' the error." Id. at 64 (citing United States v. Tweed, 503 F.2d 1127 (7th Cir. 1974); State v. Dixon, 5 Or. App. 113, 481 P.2d 629 (1971)).

In early 2000, the United States Supreme Court decided United States v. Martinez-Salazar, holding that a defendant who elects to cure an erroneous denial of a for-cause challenge by exercising a peremptory challenge and "is subsequently convicted by a jury on which no biased juror sat . . . has not been deprived of any rule-based or constitutional right." 528 U.S. 304, 307, 317, 120 S. Ct. 774, 145 L. Ed. 2d 792 (2000). Even though Martinez-Salazar exhausted all of his peremptory challenges, the Court reasoned that he was not required to use his peremptory challenge curatively but made the "hard choice" to do so:

> After objecting to the District Court's denial of his for-cause challenge, Martinez-Salazar had the option of letting Gilbert sit on the petit jury and, upon conviction, pursuing a Sixth Amendment[1] challenge on appeal. Instead, Martinez-Salazar elected to use a challenge to remove Gilbert because he did not want Gilbert to sit on his jury. This was Martinez-Salazar's choice. The District Court did not demand—and Rule 24(b) did not require—that Martinez-Salazar use a peremptory challenge curatively.
> In choosing to remove Gilbert rather than taking his chances on appeal, Martinez-Salazar did not lose a peremptory challenge. Rather, he used the challenge in line with a principal reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury.

Id. at 309, 315–16.

Soon after, in State v. Roberts, the Washington Supreme Court considered a claim that a trial court's erroneous denials of challenges for cause against 13 jurors, four of whom were seated before being removed by defense peremptory challenges, forced the defendant to exhaust his peremptory challenges prematurely. 142 Wn.2d 471, 517, 14 P.3d 713 (2000). The court cited Martinez-Salazar as support for its statement that "[i]t is well established that an erroneous

---

[1] U.S. Const. amend. VI.

denial of a challenge for cause may be cured when the challenged juror is removed by peremptory." Id. The court noted that Roberts had "not only used his peremptory challenges to remove the four seated jurors he unsuccessfully challenged for cause but also turned down the trial court's offer of two extra peremptory challenges." Id. at 518. Therefore, the court held, Roberts' rights were not violated because he could not demonstrate that jurors who should have been removed for cause actually sat on the panel. Id.

The following year, the Washington Supreme Court decided the two cases on which the parties here primarily rely for their positions. The State largely depends on State v. Clark for its argument that Peña Salvador cannot obtain a new trial based on the allegedly erroneous denial of a challenge for cause if he failed to exercise all available peremptory challenges. 143 Wn.2d 731, 24 P.3d 1006 (2001). In Clark, the defendant exercised all but one of his peremptory challenges and argued on appeal that he "effectively used [his] final peremptory challenge" against the next juror that he thought would be seated if he used his peremptory challenge against any of the jurors on the panel. Id. at 762–63. Clark had not challenged any of the ultimately seated jurors for cause. Id. The court declined to review the merits of Clark's challenges to the jury composition, noting, "At the threshold this issue is not properly raised because Clark accepted the jury as ultimately empaneled and did not exercise all of his peremptory challenges. Under well-settled case law, Clark can therefore show no prejudice based on the jury's composition." Id.

Peña Salvador distinguishes Clark on the grounds that the jury empaneled in that case contained no jurors to whom the defendant had actually objected. See id. at 763–64. He also points out that none of the cases cited by Clark as the "well-settled case law" underlying its decision involved challenges to a specific juror. See State v. Tharp, 42 Wn.2d 494, 500, 256 P.2d 482 (1953) (challenge to the trial court's failure to administer the juror oath raised for the first time on appeal); State v. Collins, 50 Wn.2d 740, 744, 314 P.2d 660 (1957) (challenge to questions asked by the prosecutor during voir dire); State v. Robinson, 75 Wn.2d 230, 231–32, 450 P.2d 180 (1969) (claim of prosecutorial misconduct during voir dire); State v. Gentry, 125 Wn.2d 570, 615–16, 888 P.2d 1105 (1995) (challenge to inadvertent replacement of a regular juror by an alternate juror raised for the first time on appeal); State v. Elmore, 139 Wn.2d 250, 277, 985 P.2d 289 (1999) (claim of improper questioning by the prosecutor during voir dire raised for the first time on appeal).

Although it contains rather broad language, we agree that Clark is not precisely on point here because the defendant in that case did not raise an objection to any specific member of the jury. The fact that the Clark decision did not discuss Martinez-Salazar, Parnell, Stentz, or any other case specifically addressing the denial of a for-cause challenge also indicates that it is not directly applicable to this situation.

Peña Salvador argues that the correct rule stems from State v. Fire and its progeny. 145 Wn.2d 152. In Fire, the Washington Supreme Court considered a factual situation analogous to Martinez-Salazar:

At issue in this case is whether the trial court abused its discretion in denying a challenge for cause to Juror No. 8 and whether, without a further showing of prejudice, reversal is the remedy for a trial court's error in not dismissing a potential juror for cause where the defendant later uses a peremptory challenge to remove that juror and exhausts his remaining challenges before the final selection of the jury.

Id. at 157. Four justices believed that the rule in Stentz and Parnell—"that the forced use of a peremptory challenge constitutes the loss or deprivation of a challenge"—was no longer good law in Washington and that Martinez-Salazar articulated the current rule. Id. at 162–63. One justice concurred in result, opining that, although Parnell remained good law, it should be abandoned in favor of Martinez-Salazar. Id. at 165–66 (Alexander, C.J., concurring). The remaining four justices dissented, writing that the lead opinion ignored "well-established precedent and overrule[d] sub silentio no fewer than six decisions of this court." Id. at 168 (Sanders, J., dissenting).

Although the decision was fractured, a majority of the court agreed that the Martinez-Salazar rule should be adopted in Washington and that Fire could not show prejudice even if the juror should have been removed for cause because the challenged juror did not sit on the panel. Id. at 154, 159, 165–67. The lead opinion in Fire also referenced the reasoning in Martinez-Salazar that "'a hard choice is not the same as no choice'" and the alternatives laid out by the United States Supreme Court:

As the Court indicated, if a defendant believes that a juror should have been excused for cause and the trial court refused his for-cause challenge, he may elect not to use a peremptory challenge and allow the juror to be seated. After conviction, he can win reversal on appeal if he can show that the trial court abused its discretion in denying the for-cause challenge.

Id. at 158 (quoting Martinez-Salazar, 528 U.S. at 315).

In support of his argument, Peña Salvador cites two decisions of this court that rely on Fire: State v. Gonzales, 111 Wn. App. 276, 45 P.3d 205 (2002), and State v. David, 118 Wn. App. 61, 74 P.3d 686 (2003), modified on remand on other grounds, 130 Wn. App. 232, 122 P.3d 764 (2005). In Gonzales, we determined that the trial court had erred in denying a for-cause challenge, resulting in the seating of a biased juror. 111 Wn. App. at 282–83. Although the defendant did not exhaust his peremptory challenges, the Gonzales opinion did not analyze whether the issue was waived. Id. at 280–82. Rather, the court summarily stated that, "[w]hen a defendant is denied his or her constitutional right to a fair and impartial jury, the remedy is reversal," citing the language from Fire describing the defendant's "options" of using a peremptory challenge or allowing the challenged juror to be seated. Id. at 282.

In David, this court explicitly rejected the State's argument that the defendant had waived his right to argue that two jurors were biased because he failed to use all of his peremptory challenges. 118 Wn. App. at 68. The David court declared that the "Supreme Court rejected that argument in State v. Fire" and concluded that,

> a defendant need not use all of his peremptory challenges before he can show prejudice arising from the selection and retention of a particular juror. In fact, the opposite is true, if a defendant exhausts his peremptory challenges to remove a juror after denial of a for-cause challenge, the defendant cannot then argue on appeal that he was prejudiced by the denial of the for-cause challenge, because the juror was not seated.

Id. We reached the merits of the issue and found no error in the denial of the challenges for cause. Id. at 70–71.

Peña Salvador argues that "Fire, Gonzales, and David make it clear that defense counsel must not use a peremptory challenge on a juror if the goal is to preserve appellate review following denial of a for-cause challenge." The State contends that Peña Salvador reads these cases too broadly. It argues that "Fire presented a completely different issue" because the defendant had exhausted his peremptory challenges. 145 Wn.2d at 165. It also characterizes Gonzales is "ill-founded" because it "quotes the dicta in Fire, without further analysis, as authority to reverse a conviction due to the erroneous denial of a for-cause challenge even though the defendant did not exhaust all his peremptory challenges."

The State's argument suggests that whether or not defendants have exhausted their peremptory challenges constitutes a significant distinction that Gonzales and David failed to confront. When a defendant exhausts their peremptory challenges, they face the "hard choice" referenced in Martinez-Salazar between excusing one juror or another. By contrast, the State analogizes the situation in which a defendant allows a challenged juror to sit on the jury despite having unused peremptory challenges to the doctrine of invited error:

> Just as a defendant who affirmatively agrees to the wording of a jury instruction cannot later challenge the instruction even on constitutional grounds, . . . a juror who accepts a jury panel without exhausting peremptory challenges should not be allowed to later complain that his constitutional rights were violated by the seating of a juror he affirmatively accepted.

The State contends that Peña Salvador's articulation of the rule creates a situation in which,

a defendant who believes the denial of his for-cause challenge was clearly erroneous is incentivized to sit on his hands, even when it would cost him nothing to remove the allegedly biased juror, and enjoy a "heads I win, tails you lose" situation: if he wins a favorable jury verdict, he can pocket his victory, and if he loses, he can get a new trial.

Despite the compelling parallels to the invited error doctrine and the factual distinctions from Fire and Martinez-Salazar, the Washington Supreme Court has not differentiated between cases in which a defendant has exhausted their peremptory challenges and those in which they have not for purposes of the waiver argument. Reading together the existing authority in Martinez-Salazar, Fire, Gonzales, and David, we cannot definitively conclude that Peña Salvador's challenge to Juror 44 is waived because he did not exhaust his peremptory challenges. We will consider the merits of Peña Salvador's claim.

B. Actual Bias

The Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington Constitution guarantee a criminal defendant the right to trial by an impartial jury. State v. Guevara Diaz, 11 Wn. App. 2d 843, 854–55, 456 P.3d 869 (2020). To protect this right, the trial court should excuse a prospective juror for cause if the juror's views "would '"prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."'" Gonzales, 111 Wn. App. at 277–78 (quoting State v. Hughes, 106 Wn.2d 176, 181, 721 P.2d 902 (1986)). "The presence of a biased juror cannot be harmless; the error requires a new trial without a showing of prejudice." State v. Irby, 187 Wn. App. 183, 193, 347 P.3d 1103 (2015).

We review a trial court's determination of whether to dismiss a juror for abuse of discretion. State v. Depaz, 165 Wn.2d 842, 852, 204 P.3d 217 (2009). A trial court abuses its discretion when it bases its decision on untenable grounds or reasons. Id. The trial court is in the best position to determine a juror's ability to be fair and impartial because it can observe the juror's demeanor and evaluate and interpret their responses during voir dire. State v. Noltie, 116 Wn.2d 831, 839, 809 P.2d 190 (1991). Establishing a manifest abuse of discretion requires more than "a mere possibility of prejudice." Id. at 840. "But the 'trial court's broad discretion in the conduct of voir dire is nevertheless subject to essential demands of fairness.'" Guevara Diaz, 11 Wn. App. 2d at 856 (quoting Hughes v. United States, 258 F.3d 453, 457 (6th Cir. 2001)) (internal quotation marks omitted).

At trial, either party may challenge a prospective juror for cause on the grounds of actual bias. RCW 4.44.130; RCW 4.44.170(2). Actual bias is "the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging." RCW 4.44.170(2).

A trial court need not excuse a prospective juror with preconceived opinions if the juror can set those ideas aside and decide the case on the evidence at trial and the law as provided by the court. RCW 4.44.190; Guevara Diaz, 11 Wn. App. 2d at 855. But a juror should be excused if it appears from all the circumstances that the juror cannot disregard a preconceived opinion and try the issue impartially. RCW 4.44.190. The trial court should always presume juror bias if it hears "a

'statement of partiality without a subsequent assurance of impartiality.'" Guevara Diaz, 11 Wn. App. 2d at 855 (quoting Miller v. Webb, 385 F.3d 666, 674 (6th Cir. 2004)). However, "equivocal answers alone do not require a juror to be removed when challenged for cause." Noltie, 116 Wn.2d at 839.

Peña Salvador cites Gonzales in support of his argument that the court erred in denying his request to exclude Juror 44. In Gonzales, a prospective juror indicated bias in favor of police witnesses and admitted that she did not know if she could presume the defendant innocent in the face of officer testimony indicating guilt. 111 Wn. App. at 281. This court determined that the juror had demonstrated actual bias because, although preference in favor of police testimony does not conclusively establish bias, the juror "[a]t no time . . . express[ed] confidence in her ability to deliberate fairly or to follow the judge's instructions regarding the presumption of innocence." Id. at 281–82.

Similarly, in State v. Irby, a prospective juror indicated that she was "more inclined towards the prosecution" because she had worked for Child Protective Services. 187 Wn. App. at 190. When asked whether that experience would affect her ability to be fair and impartial, she responded, "I would like to say he's guilty." Id. Neither the court nor the prosecutor asked any follow-up questions regarding the juror's ability to be impartial. Id. The defendant had waived counsel and voluntarily absented himself from the trial. Id. at 189. We held that the juror's response was akin to an "unqualified statement that she did not think she could be fair" and the court committed reversible error by failing to excuse the juror, even in the absence of a for-cause challenge. Id. at 196.

Peña Salvador argues that this case is analogous to Gonzales and Irby because Juror 44 "repeatedly stated that he was not sure if he could be fair" and "he was never able to assure the parties and the court that he could be fair." He contends that the court failed to acknowledge that the prospective juror had expressed actual bias in favor of children. The State argues that the trial court properly exercised its discretion in denying the motion to exclude Juror 44 for cause because the record does not indicate a reasonable probability, rather than a mere possibility, that Juror 44 was actually biased. Rather, the State contends that Juror 44's comments show that he "was not reporting any actual identifiable bias, but merely that he was 'afraid [he] might be' biased given what he had learned about unconscious bias." It argues that Juror 44's responses about evaluating credibility of witnesses "demonstrat[e] that his equivocation had more to do with his fear of making a mistake (by failing to accurately discern the truth) than with any actual bias."

In context, the prospective juror's comments appear to show that he was aware of the possibility of unconscious bias, was worried about hearing evidence that might be upsetting, and was concerned about his ability to evaluate the evidence correctly. Although he initially expressed some preconceived opinions and potential partiality, he affirmatively stated that he understood the presumption of innocence and that he would listen to both sides. Juror 44's equivocal statements are not sufficient to establish more than a mere possibility of actual bias, and Peña Salvador has not shown that the trial court abused its discretion in denying his motion to remove the juror for cause.

II.     Community Custody Conditions

Peña Salvador challenges one of the standard conditions of community custody imposed and two of the special conditions imposed because he was convicted of a sex offense.  Specifically, he challenges standard condition 4, requiring him to "[p]ay supervision fees as determined by the Department of Corrections [DOC];" special condition 15, prohibiting all "direct or indirect contact with minors;" and special condition 17, which provides that he shall:

> [s]tay out of areas where children's activities regularly occur or are occurring. This includes parks used for youth activities, schools, daycare facilities, playgrounds, wading pools, swimming pools being used for youth activities, play areas (indoor or outdoor), sports fields being used for youth sports, arcades, and any specific location identified in advance by DOC or the [Community Corrections Officer].

A.  Contact with Minors

First, Peña Salvador contends that special condition 15, which prohibits all direct or indirect contact with minors, is not narrowly tailored to address contact with his two biological sons and interferes with his fundamental constitutional right to parent.  He argues that remand is required for modification and appropriate tailoring of this condition.  Sentencing conditions that interfere with a defendant's fundamental constitutional right to parent their biological children "must be 'sensitively imposed' so that they are 'reasonably necessary to accomplish the essential needs of the State and public order.'"  In re Pers. Restraint of Rainey, 168 Wn.2d 367, 377, 229 P.3d 686 (2010) (quoting State v. Warren, 165 Wn.2d 17, 32, 195 P.3d 940 (2008)).

The State agrees that the trial court mistakenly failed to consider Peña Salvador's constitutional right to parent his biological children when prohibiting contact with any minors. It noted that the record indicates that the court intended for the community custody no-contact condition to mirror the no-contact condition of the sentence but that, in an apparent oversight, the boilerplate language of Appendix H to the judgment and sentence was not modified to reflect the court's oral ruling. Accordingly, the State concedes that remand is appropriate to allow the sentencing court to consider whether to modify the condition based on the restrictions the court finds reasonably necessary to prevent harm to Peña Salvador's biological children. We accept the State's concession and remand for reconsideration of this condition.[2]

B. Areas Where Children's Activities Occur

Peña Salvador also argues that the condition barring him from "areas where children's activities regularly occur or are occurring" is vague and ambiguous and that, as written, it is not sufficiently crime-related. The State argues that the condition is not unconstitutionally vague because it provides adequate notice of the areas Peña Salvador is to avoid, all of which are sufficiently crime-related, and contains sufficient standards to prevent arbitrary enforcement.

A sentencing court may order an offender to comply with any crime-related prohibitions as part of a term of community custody. RCW 9.94A.703(3)(f). A

---

[2] Peña Salvador also argues that defense counsel was ineffective when she failed to object to this condition of community custody. Because we accept the State's concession that remand is appropriate, we need not address Peña Salvador's claim that his counsel was ineffective for failing to object to the no-contact provisions.

defendant may challenge conditions of community custody for the first time on appeal. State v. Padilla, 190 Wn.2d 672, 677, 416 P.3d 712 (2018). When the challenge involves a legal question that can be resolved on the existing record, we may address it pre-enforcement. Id. We review community custody conditions for abuse of discretion. Id. "A trial court necessarily abuses its discretion if it imposes an unconstitutional community custody condition, and we review constitutional questions de novo." State v. Wallmuller, 194 Wn.2d 234, 238, 449 P.3d 619 (2019).

The Fourteenth Amendment to the United States Constitution and article I, section 3 of the Washington State Constitution require that citizens have fair warning of proscribed conduct. State v. Bahl, 164 Wn.2d 739, 752, 193 P.3d 678 (2008). "A legal prohibition, such as a community custody condition, is unconstitutionally vague if (1) it does not sufficiently define the proscribed conduct so an ordinary person can understand the prohibition or (2) it does not provide sufficiently ascertainable standards to protect against arbitrary enforcement." Padilla, 190 Wn.2d at 677. However, a condition "'is not unconstitutionally vague merely because a person cannot predict with complete certainty the exact point at which his actions would be classified as prohibited conduct.'" Id. (quoting State v. Sanchez Valencia, 169 Wn.2d 782, 793, 239 P.3d 1059 (2010)). "[D]ue process does not require 'impossible standards of specificity.'" Wallmuller, 194 Wn.2d at 242 (quoting City of Seattle v. Eze, 111 Wn.2d 22, 26–27, 759 P.2d 366 (1988)). Rather, "in the context of community custody, court may enforce 'commonsense'

restrictions, including those that use nonexclusive lists to elucidate general phrases." Id. at 242–43.

Peña Salvador argues that, because the first portion of the condition is written in the disjunctive ("areas where children's activities regularly occur or are occurring"), the illustrative list that follows "becomes internally confusing." He contends that the mix of clearly prohibited "locations that appear to be child-specific, such as schools, daycare facilities, and arcades," and those that are "not necessarily child-specific, such as parks, swimming pools, and sports fields," makes it unclear whether, for example, he is prohibited "from going for a walk or jog in a park [in] the dead of winter, even though youth camps are routinely held at the park in the summer." Peña Salvador contends that Wallmuller is inapplicable because it did not address the specific language challenged here.

Peña Salvador analogizes this condition to that analyzed in United States v. Peterson, 248 F.3d 79 (2d Cir. 2001). In Peterson, the Second Circuit found that a condition prohibiting the defendant from "being on any school grounds, child care center, playground, park, recreational facility or in any area in which children are likely to congregate" ambiguous because "[i]t is not clear whether the clause 'in which children are likely to congregate' applies only to 'any area,' or to the other places listed." Id. at 86. The court explained that, as written, it was "unclear whether the prohibition applies only to parks and recreational facilities in which children congregate, or whether it would bar the defendant from visiting Yellowstone National Park or joining an adult gym." Id. Peña Salvador argues

that, as in Peterson, the "use of the word 'or' renders the interplay between the two parts of the condition ambiguous."

The State points to a number of cases in which we have upheld identical or very similar conditions against vagueness challenges, but it concedes that the specific argument advanced by Peña Salvador has not been addressed by this court in a published opinion. However, the State contends that the condition makes clear that Peña Salvador is to stay away from two types of areas: (1) areas where children's activities regularly occur, regardless of whether they are currently occurring, and (2) areas where children's activities are currently occurring, regardless of whether they regularly occur in that location. The nonexclusive, illustrative list that follows serves to clarify that basic rule. Reading the entire condition together, the State argues that "the fact that a children's activity occurred in a park in the distant past would not be sufficient to bring it within the scope of Special Condition 17." The illustrative list in Peterson, by contrast, precedes the reference to "area[s] in which children are likely to congregate," rendering it unclear whether this clause applied to the specific areas listed or only to other areas not specifically listed. Id.

Reading the condition "in a commonsense way and in the context of the other conditions,"[3] the scope of the prohibited conduct is sufficiently clear. Although the condition does not specify how often an activity must occur to qualify as a "regular" occurrence, a commonsense reading makes clear that, in Peña Salvador's example, the youth activities would be too remote to bring the conduct

---

[3] Wallmuller, 194 Wn.2d at 245.

within the scope of the condition. The condition does not specify the exact boundaries of the prohibited conduct but is not impermissibly vague.

C. Supervision Fees

Peña Salvador also challenges the imposition of a community custody condition requiring him to "[p]ay supervision fees as determined by DOC." He argues both that RCW 10.01.160(3) forbids the imposition of these fees on an indigent defendant and that the record demonstrates that the court did not intend to impose the fees. He contends that the requirement that he pay for supervision should be stricken from the judgment and sentence.

The State maintains that supervision fees may be imposed lawfully on an indigent defendant but agrees that the fees are waivable. However, the State contends that the record is unclear regarding whether the trial court intended to impose the discretionary supervision fees. Because the State concedes that the case should be remanded to address other sentencing issues, it requests that we direct the trial court to clarify its intent regarding the supervision fees on remand and strike them if appropriate.

Community custody supervision fees are discretionary legal financial obligations (LFOs) that are waivable by the trial court. State v. Dillon, 12 Wn. App. 2d 133, 152, 456 P.3d 1199 (2020). Where the record demonstrates that the trial court intended to impose only mandatory LFOs but inadvertently imposed supervision fees, it is appropriate for us to strike the condition of community custody requiring these fees. See id. In State v. Dillon, we concluded that the trial court had inadvertently imposed the supervision fees when it waived all other

discretionary LFOs, imposed only the "truly mandatory" victim penalty assessment, and did not mention supervision fees at sentencing. Id.

During Peña Salvador's sentencing, the court briefly referenced LFOs after announcing the term of incarceration and community custody: "I will impose credit for time served. No contact with L.O. and J.O. Restitution to be determined. Mandatory court costs. No non-mandatory court costs. I will impose the standard conditions for the Department of Corrections." Peña Salvador inquired about the LFOs later in the hearing:

> [DEFENSE COUNSEL]: Your Honor, the Defendant was asking about the fines, indicating that he has no way to pay, and I was just wondering if there is a way to get any of the fines waived. I understand so far it's only about six hundred dollars.
>
> THE COURT: Those are mandatory court costs that are not waivable (sic) by the Court. It is five hundred dollars for the victim penalty assessment and one hundred dollars for the DNA fee.

The State argues that the court's intent is unclear because of its use of the term "court costs," which it argues does not apply to supervision fees, and because it specified that it would impose the standard conditions of community custody. However, this situation is analogous to that in Dillon: the trial court stated that it intended to impose only the mandatory victim penalty and DNA fees and did not discuss supervision fees at all. As in Dillon, it appears that the trial court here intended to waive all discretionary LFOs and imposed supervision fees inadvertently as a result of the boilerplate language contained in the document. Therefore, it is appropriate to strike the condition requiring payment of the supervision fees from the judgment and sentence.

Remanded for reconsideration of the condition prohibiting contact with any minors in light of Peña Salvador's right to parent his biological children and to strike the condition requiring payment of the supervision fees from the judgment and sentence.[4]  Jury verdict is affirmed.

WE CONCUR:

_____

_____                    _____
Coburn, J.                                          Andrus, A.C.J.

---

[4] Peña Salvador also requests that we remand for correction of a scrivener's error in the judgment and sentence. The State agrees that, on remand, the trial court should correct the judgment and sentence to reflect that count two occurred on "03/20/2012 through 03/19/2015."