# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

Respondent,

v.

JORGE HERNANDEZ AGUILAR,

Appellant.

No. 81078-2-I

DIVISION ONE

UNPUBLISHED OPINION

APPELWICK, J. — A jury convicted Hernandez Aguilar of first degree assault with several aggravators after a brutal incident in which he cut his wife's throat with a knife. During trial, an improper statement prompted the defense to move for a mistrial. The court denied the motion and Hernandez Aguilar now appeals. The exceptional sentence imposed was not supported by written findings of fact and conclusions of law. Community custody supervision fees imposed under the judgment and sentence were inconsistent with the court's order. We affirm the conviction, but vacate his sentence and remand for resentencing.

FACTS

One evening, Nancy Cumming was outside with some neighbors when she heard somebody yell for help. Cumming looked in the direction of the noise and saw a woman, Ana Sosa Gutierrez, running toward her from a nearby house. Sosa Gutierrez was frantic and appeared to be bleeding. She collapsed in the road next to the sidewalk. Cumming ran to Sosa Gutierrez and then ran to the neighbors

screaming for them to call 911. Cumming returned to Sosa Gutierrez who was covered in blood. She was actively bleeding with blood beginning to pool around her. Cumming asked Sosa Gutierrez, "Who did this to you?" and she replied, "My husband." Sosa Gutierrez began panicking and screaming, "My babies, my babies." Cumming tried to reassure her and apply pressure to stop the bleeding. Cumming stayed with Sosa Gutierrez until the ambulance and police responded.

Sosa Gutierrez arrived at the hospital in unstable condition, having lost a significant amount of blood from a neck wound. During surgery, the surgeon discovered the wound, about the depth of her neck, went through the jugular vein and then back toward her spine, injuring the vertebral artery. Sosa Gutierrez received transfusions of two and half liters of blood, approximately half the blood volume of her body. She survived her injuries, but she would have bled to death at the scene if Cumming and the paramedics had not maintained pressure on the wound.

While Sosa Gutierrez received aid, the police arrested her husband, Jorge Hernandez Aguilar. As the police handcuffed him, Hernandez Aguilar said, "I love my wife, I love my kids, I'm sorry." He continued to repeat, "I'm sorry, I love my wife." He also asked if his wife was dead. Hernandez Aguilar had blood on his arms and hands.

The State charged Hernandez Aguilar with first degree assault with a domestic violence aggravator and a deadly weapon enhancement.

Several witnesses testified about the events of that day. The landlord who lived on the property testified about seeing the three children after the stabbing.

2

The youngest child was shaking and had blood on his arm and shirt. The oldest child said that his parents had been fighting and kept repeating, "My dad was trying to sacrifice my mom." The boy mimed a stabbing motion and said that his mom's hands were up to protect her neck but his dad "got her in the neck. And that's how he knew his dad was trying to sacrifice his mom."

When the oldest child, a nine year old boy, testified, he talked about watching television and hearing his mom call for help from the kitchen. The boy made his way to the kitchen and told his dad to stop. His dad was sitting on the ground next to his mom with a knife nearby. He remembered telling the police that his dad had been holding the knife. He saw blood on the ground in the kitchen, on the living room walls, and on his mother.

Sosa Gutierrez's niece, Heydi Sosa Gamez, testified that her aunt and Hernandez Aguilar had been arguing in the kitchen when she heard a drawer open. Hernandez Aguilar yelled that if Sosa Gutierrez was not with him, she would not be with anyone else. Hernandez Aguilar then shouted at Sosa Gamez to take care of the three children. When Sosa Gamez went into the kitchen she saw, "Jorge had my aunt thrown down onto the floor. Half of the body was leaning up against the jamb of the door. And he was like on top of her."

Sosa Gutierrez testified that she and Hernandez Aguilar were married for 10 years. During their marriage, he had "jealousy episode[s]." He accused her of seeing other people. When Sosa Gutierrez went to the store, he always wanted to know who she saw and talked to there. One night, about seven months before the stabbing, Hernandez Aguilar again accused Sosa Gutierrez of having an affair

3

with someone. This time, she threatened to leave him. Hernandez Aguilar told her he would rather see them all dead than for her to leave the house.

The marriage deteriorated. Sosa Gutierrez began sleeping in the children's bedroom, they were not talking, and Hernandez Aguilar was drinking and spending more and more time outside the house. About a month before the incident, Sosa Gutierrez told Hernandez Aguilar she would leave him if things did not change. Eventually Sosa Gutierrez made the decision to leave and told Hernandez Aguilar she wanted to separate.

The night before the incident, Sosa Gutierrez was lying in the children's room when Hernandez Aguilar came in and asked if their separation was definite. Sosa Gutierrez testified, "When I told him that it was definite, because he was almost on top of me, I told him to step back, and he went down almost to my feet, and he hit the mattress with his fist. He was angry." Hernandez Aguilar accused her of having a relationship with her brother's friend. The testimony continued:

Q. Did there come a point in your conversation that night when he accused you of infidelity?

A. He asked me if I knew Raul [Figueroa], and I told him that I did not. And he told me that, yes, I did—yes, I knew him. But I didn't know him.

Q. Did he accept that?

A. No.

Q. Did there come a point where he confronted you with your underwear?

A. Yes.

Q. Would you describe when that happened during the course of the conversation?

4

> A. He just came on top of me. He wanted me to spend the night with him. And I told him that I don't want to. He touched my intimate parts.

The defense objected to this testimony. The court sustained the objection, ordered the statement stricken from the record, and instructed the jury to disregard it. The defense then moved for a mistrial:

> We have interviewed this witness. She's been interviewed several times. We have transcripts of those interviews. Never, not once, has she ever alleged any touching of an intimate area. So aside from having to defend my client against an assault one with a deadly weapon with several enhancements, now I have to somehow in the middle of the trial undo a potential rape allegation. And I don't believe it's fair for my client at this point. The jury's already heard it despite you asking them quickly to disregard it. It's there. And at this point it is so prejudicial that there is no way at this point for me to rehabilitate her in any way during cross.

The trial court noted the ambiguity of the testimony and recessed to allow the parties to speak with Sosa Gutierrez for clarification. After the recess, the parties reported that Sosa Gutierrez meant that Hernandez Aguilar had touched her on her underwear. After much discussion, the court found the testimony improper, "[i]f for no other reason, it was a surprise and involved some type of physical contact." But, the defense immediately objected and the court sustained and struck the testimony. The jury was advised the testimony was stricken. The trial court determined the jury could follow the court's instructions and denied the motion for mistrial.

In deciding how to continue, the court offered the opportunity for the State to ask questions to clarify the testimony or leave the "this whole area about underwear alone." Hernandez Aguilar chose to leave the subject alone. As the

5

trial court observed, the testimony "is still limited and somewhat ambiguous." The trial continued with no further discussion of Sosa Gutierrez's underwear.[1]

Sosa Gutierrez testified that she and Hernandez Aguilar had argued immediately before the incident. She was in the kitchen washing dishes when he came in and told her that she would not belong to anyone else. He opened a drawer and grabbed a knife. According to Sosa Gutierrez, "He approach me and he put it in front of me. And I told him to think what he was about to do. And to think of the children. And he turn around, and he put it back inside the drawer. And then he went to the living room." Hernandez Aguilar returned and took the knife out and held it out in front of her again. She asked him to think of the children but he cut "into [her] neck." He was looking at her, and she described him as angry, with eyes full of hatred. "I struggle a lot because he wanted to get me with the knife deeply."

Sosa Gutierrez briefly managed to get away and tried to escape but Hernandez Aguilar pulled her back by the shirt, pushed her back against the stove, and tried to continue stabbing her. They continued to struggle until Sosa Gutierrez began to lose strength. She told Hernandez Aguilar to take care of the children but he said he was going to stab himself. Then their oldest son came into the room and told Hernandez Aguilar to let her go. Hernandez Aguilar told his son to go up to his room, but the boy was frozen in place. Hernandez Aguilar took the boy to his room. Sosa Gutierrez ran out of the house where the neighbors helped her.

---

[1] The State hoped to use the underwear testimony to underscore Hernandez Aguilar's jealousy. Hernandez Aguilar would examine Sosa Gutierrez's dirty underwear and accuse her of being unfaithful.

A jury convicted Hernandez Aguilar of first degree assault and found that he was armed with a deadly weapon at the time of the crime, that he and Sosa Gutierrez were members of the same family or household, and that the crime occurred within the sight or sound of their minor child. The standard sentence range for first degree assault with the deadly weapon enhancement was 117 to 147 months. The trial court imposed an exceptional sentence of 159 months. The court also waived all discretionary legal financial obligations (LFOs). Hernandez Aguilar appeals.

## DISCUSSION

### I. Mistrial

Hernandez Aguilar claims the trial court erred by denying his motion for a mistrial. Trial courts should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can insure a fair trial. State v. Rodriguez, 146 Wn.2d 260, 270, 45 P.3d 541 (2002). In considering a motion for a mistrial, the court examines "(1) the seriousness of the irregularity, (2) whether the statement in question was cumulative of other evidence properly admitted, and (3) whether the irregularity could be cured by an instruction to disregard the remark, an instruction which a jury is presumed to follow." State v. Escalona, 49 Wn. App. 251, 254, 742 P.2d 190 (1987). We review a trial court's denial of a motion for mistrial for abuse of discretion. Rodriguez, 146 Wn.2d at 269. "A trial court's denial of a motion for mistrial will be overturned only when there is a 'substantial likelihood' that the error prompting the request for a mistrial affected

the jury's verdict." Id. at 269-70 (internal quotation marks omitted) (quoting State v. Russell, 125 Wn.2d 24, 85, 882 P.2d 747 (1994)).

As the trial court noted, Sosa Gutierrez's statement that Hernandez Aguilar touched her private parts was improper. Despite this, the denial of the motion for mistrial was not an abuse of discretion. The statement was immediately stricken and the jury was told to disregard the evidence. The evidence was overwhelming as to Hernandez Aguilar's guilt. Sosa Gutierrez's testimony was graphic and detailed. Her depiction of the events was confirmed by statements from other witnesses including her niece and young son. A single statement about Hernandez Aguilar touching her private parts was insignificant in light of the thorough description of their argument, his threats, and the brutal attack. There is no likelihood that the improper statement affected the jury's verdict.

## II. Exceptional Sentence

Hernandez Aguilar argues his sentence should be vacated and the matter remanded for resentencing because the trial court failed to enter findings of fact and conclusions of law supporting the exceptional sentence.

The Sentencing Reform Act of 1981 (SRA) allows a trial court to deviate from a standard range sentence if "there are substantial and compelling reasons." RCW 9.94A.535. When imposing an exceptional sentence, the trial court "shall set forth the reasons for its decision in written findings of fact and conclusions of law." RCW 9.94A.535. "[T]he SRA's written findings provision requires exactly that—written findings." State v. Friedlund, 182 Wn.2d 388, 394, 341 P.3d 280 (2015). "Verbal reasoning" does not satisfy the requirements of the statute. Id.

Here, the trial court appended the jury's special verdicts for the aggravating factors to the judgment and sentence. The court also discussed the facts and its reasons for imposing an exceptional sentence at the sentencing hearing. But, the trial court failed to enter any written findings of fact and conclusions of law as required by RCW 9.94A.535. We vacate the sentence and remand to the trial court for resentencing with the appropriate findings of fact and conclusions of law, if an exceptional sentence is again imposed.

III.   Discretionary Legal Financial Obligations

Hernandez Aguilar also requests we strike community custody supervision fees erroneously imposed because he is indigent.

Community custody supervision fees are discretionary LFOs that can be waived by the trial court. State v. Dillon, 12 Wn. App. 2d 133, 152, 456 P.3d 1199, review denied, 195 Wn.2d 1022, 464 P.3d 198 (2020); RCW 9.94A.703(2)(d). "Where the record demonstrates that the trial court intended to impose only mandatory LFOs but inadvertently imposed supervision fees, it is appropriate for us to strike the condition of community custody requiring these fees." State v. Peña Salvador, 17 Wn. App. 2d 769, 791-92, 487 P.3d 923 (2021). The trial court recognized that Hernandez Aguilar is indigent and noted that it would "try to minimize the financial aspects [of the sentence]." To that end, the trial court expressly limited the LFOs to $600, comprised of the mandatory $500 victim penalty and $100 DNA (deoxyriboneucleic acid) fee. Because the record supports that the court intended to impose only the mandatory LFOs, we remand for the trial

9

court to strike the community custody supervision fees from the judgment and sentence.

We affirm the conviction, but vacate his sentence and remand for resentencing.

_Appelwick, J._

WE CONCUR:

_Bowman, J_          _Chun, J._