IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 80334-4-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| WILLIAM E. TALBOTT II, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

HAZELRIGG, J. — William E. Talbott II was found guilty of two counts of aggravated murder in the first degree following a jury trial. He was arrested over 30 years after the murders were committed. Talbott asserts numerous evidentiary and constitutional errors occurred at trial that warrant reversal. Since seating a biased juror is reversible error, we need not reach his other various challenges argued in briefing or the issues Talbott raises in a pro se statement of additional grounds for review. We reverse.

FACTS

Jay Cook and Tanya Van Cuylenborg left Victoria, British Columbia on November 18, 1987. Cook was 20 and Van Cuylenborg was 18-years-old. The couple was on an errand for Cook's father to retrieve furnace parts from Gensco, Inc. in Seattle.

Citations and pinpoint citations are based on the Westlaw online version of the cited material.

On November 24, 1987, Van Cuylenborg's body was discovered down a steep embankment off Parson Creek Road in a rural wooded area in Skagit County. She was nude from the waist down, her bra was pulled above her breasts and she had a single, close-range gunshot wound to the back of her head. A bullet fragment was recovered from her skull.

The following day, the van that the pair had been traveling in was found in Whatcom County. Inside the van was a money order made out to Gensco. A used tampon and a comforter, with what appeared to be blood on it, were also found in the rear cargo area.

On November 26, 1987, Cook's body was discovered in a rural area of Snohomish County. Cook was partially covered with a blue blanket and he had multiple blunt force wounds to his head. A pack of cigarettes had been shoved down his throat. Cook's cause of death was determined to be strangulation by ligature, specifically twine and what appeared to be a red dog collar.

An unknown DNA[1] profile was developed from a semen stain on Van Cuylenborg's pants found inside the van. A vaginal swab taken from Van Cuylenborg's body contained the same male DNA profile. Another non-sperm DNA profile was also identified on the vaginal swab. Cook was excluded as the contributor of either DNA profile. No comparison could ultimately be made as to the non-sperm DNA profile.

Through genealogy matching in 2018, William Talbott was identified as a possible source of the unknown male DNA profile developed from the semen. As

---

[1] Deoxyribonucleic acid.

a result, undercover officers surveilled Talbott and eventually collected a coffee cup he discarded. Talbott's DNA from the coffee cup matched the male profile from Van Cuylenborg's pants and vaginal swab. Based on this match, police arrested Talbott at his job site in May 2018.

Talbott was charged with two counts of aggravated murder in the first degree and proceeded to trial. During voir dire, a juror was identified for further individual questioning based on her answers to a general questionnaire administered at the start of jury selection. During the individualized inquiry, the juror indicated that she believed she might have difficulty with the topics and evidence of the trial, due to past traumatic experiences and as a new mother, such that she was unsure if she could be fair. Talbott moved to have this juror dismissed for cause. The trial court denied the motion, and the potential juror was seated on the jury and deliberated.

At trial, the State presented a theory in which Van Cuylenborg had been murdered after she was raped and that Cook's death was related to those crimes since they were known to have been traveling together. The State admitted graphic photos of the couple's bodies, the scenes in which they were discovered, and the autopsies of the victims. There was testimony as to the vaginal swab and other forensic evidence collected from the van. The State relied on this testimony as support for its theory that Van Cuylenborg had been raped. The jury found Talbott guilty as charged following three days of deliberation. The trial court sentenced Talbott to life in prison without the possibility of parole. Talbott now timely appeals.

ANALYSIS

Talbott argues that his right to an impartial jury was violated because a juror who expressed actual bias was seated and deliberated on his case. He challenged juror 40 for cause, but it was denied by the court after individual voir dire by both parties.

As a preliminary matter, the State argues that Talbott had waived this issue by failing to exhaust all of his peremptory challenges after the for-cause challenge to juror 40 was denied. Having previously held that this precise waiver argument is incorrect, we disagree with the State and reach the issue. See State v. Peña Salvador, 17 Wn. App.2d 769, 776–83, 487 P.3d 923 (2021).

Both our federal and state constitutions guarantee a criminal defendant the right to trial by an impartial jury. State v. Guevara Diaz, 11 Wn. App. 2d 843, 854–55, 456 P.3d 869 (2020). "To protect this right, the trial court should excuse a prospective juror for cause if the juror's views 'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Peña Salvador, 17 Wn. App. 2d at 784 (internal quotation marks omitted) (quoting State v. Gonzalez, 111 Wn. App. 276, 277–78, 45 P.3d 205 (2002)). Either party may challenge a prospective juror for cause based on actual bias. RCW 4.44.130; .170(2). Actual bias is "the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging." RCW 4.44.170(2). The seating of

a biased juror cannot be harmless; such an error requires a new trial without a showing of prejudice. State v. Irby, 187 Wn. App. 183, 193, 347 P.3d 1103 (2015).

This court reviews a trial court's denial of a for-cause challenge for abuse of discretion. Guevara Diaz, 11 Wn. App. 2d at 856. Though the trial court is in the best position to evaluate a juror's ability to be fair and impartial, the trial court's discretion in conducting voir dire is "nevertheless subject to essential demands of fairness." Id. (internal quotation marks omitted) (quoting Hughes v. United States, 258 F.3d 453, 457 (6th Cir. 2011)).

Here, Talbott argues the trial judge improperly allowed juror 40 onto the jury after she had expressed actual bias and was not rehabilitated by further questioning. At oral argument on appeal, both Talbott and the State agreed that juror 40 demonstrated actual bias through her comments during voir dire and that the primary question for this court was whether she had been rehabilitated. As such, the relevant portions of voir dire are as follows:

> [Juror 40] A. Okay. I grew up in a single-parent household, and my mother was the victim of a lot of domestic abuse. So while I am able to reasonably set aside my own, I guess, experiences in life, I just wanted to put that out there, because I don't know how I would feel, being shown evidence of something that could bring up memories that I have worked to get rid of.
>
> [Defense counsel] Q. Okay. So do you think that would affect you to the point where you think you could not be fair and impartial in assessing the evidence in this case as to both the [S]tate and Mr. Talbott?
>
> A. To be honest, I—feel like I wouldn't know until the time came. But I also have a daughter, and I think that might also play a part in how I might feel. If there was some action taken towards a young woman, I might take that personally and not be able to be impartial.
>
> . . .
>
> A. She just had very abusive men in her life.
>
> Q. And so that was sort of ongoing?

A. Yes. Bad choices. Lots of them.

Q. How old is your daughter now?

A. She's 14 months.

Q. So in—from our perspective, what we're doing is, we're looking to find jurors who can just assert that they could be fair and impartial in a case like this because of the difficult subject matter. You've indicated that because of your experience, both as a daughter and a mother, that this may not be that kind of case for you.

A. Yeah. Based on what I read in the questionnaire that we were given, there was a small section that referenced seeing potentially graphic evidence. And that's where I don't know if, you know, me sitting here, just looking at photos of people I don't know, allow me to be impartial, and what I believe my judgment towards something could be.

However, I just—I don't know if a flood of emotion might come over me, if I were to look at pictures that were very graphic, or made me think what if this was my loved one, or this looks similar to something that I saw previously in my life and cloud my judgment.

Q. And I appreciate that. Obviously, we're not mind readers, and if—so you're honest in telling us that you think that this could happen, that you could see these things and feel outrage, I guess; correct?

A. I suppose.

Q. And react. Well, I mean—

A. A myriad of emotions. I don't know what could happen.

Q. When we talk about being biased, it isn't that you're an unfair person or dishonest person, it's just that you may see things that may make you think of the defendant unfavorably so you can't be fair in this case.

A. Yes.

Q. And that can be outrage from the pictures that you see, based on an emotional response that you have to them, that you don't want to consider that stuff anymore, you just want to put that in a box and be done with it; right?

In this case you would hear and see all of that kind of evidence. You would hear about a young woman, 18 years old, who was murdered, who the [S]tate is accusing of—is accusing was sexually assaulted. You would hear that her boyfriend was murdered. You would hear from family members who would testify about the loss that they've suffered. And this would go on for weeks.

I mean I can't—I don't—you have to tell me if you think that this is just not the right case for me, that there's enough of a chance that I could be biased that I don't want to sit on a jury where I have to be fair where I don't know if I can. If that's your position, I would ask that you tell me.

A. That's my position.

Q. And is there anything that would—I mean, the Court can't order you not to be emotional; right?

A. Right.

Q. I mean, the Court can't order you not to have an emotional response to certain things; correct?

A. Right. I mean, it's natural. Nobody is without emotion, I guess, unless you're a bona fide sociopath. I don't know, even then, I guess you would have some degree of emotion; right?

Q. Right

A. It's just, like I said, I'm an emotional person as it is, and I try to be very, very logical and methodical in decisions I make in my life and, you know, trying to see both sides of everything. But like I said, if it's a case involving violence and women, it's just something that I've already experienced in my life, and I fear that I will always inherently have as a mother, so that's just the one thing that I probably couldn't get past.

Q. I mean, you would be a great juror on a different kind of case; it's just not this kind of case.

A. Right.

. . .

[Deputy Prosecutor] Q. So regardless of whether or not you think you would be this—this is the best case for you to be a juror on, that's not really the question. The question is, do you think that you can take anything that happened to your mother, anything that could potentially happen to your daughter, my daughter, anyone's daughter, set those things aside, listen to the evidence, look at the evidence, and come to a conclusion at the end just based on the evidence that you hear in this courtroom.

[Juror 40] A. I could try.

Q. Okay

A. I can't guarantee anything; right?

Q. No, I think that's a fair way to put it. Especially when you're dealing with things like this, and sort of this mirror that we put in front of your soul today, so you can look in and sort of think about some of these things you probably never thought about before.

In regards to looking at the graphic evidence, once again, is that something—I don't think you're going to find anyone in here that's going to tell you you shouldn't be emotional about that, or it shouldn't affect you, but is that something that you can take those emotions, set them aside, know that bad things happened to the female and the male alleged victims in this case, but then come to a conclusion of Mr. Talbott's innocence or guilt based on the evidence, and not based on anything, any other experience that you've had?

A. I could try

Q. Okay.

A. Just to note, it's something I usually express with my husband, that there's always multiple sides to a story, and I'm a fact-based person, so I could tell you that I will give it my very best, should I end up being on the jury, to do that. I just wanted to point this out to you, in case, in how you make your determination, that's a factor, you know. I'm an emotional being, like all of us, so it's just—the potential is there.

Talbott argues his case is comparable to United States v. Kechedzian, 902 F.3d 1023 (9th Cir. 2018). In that case, the Ninth Circuit found that a biased juror was seated in violation of Kechedzian's right to an impartial jury under the Sixth Amendment to the United States Constitution. Id. at 1031. Kechedzian was charged with multiple counts relating to identity theft. Id. at 1025. During voir dire, a juror expressed that they had been a victim of identity theft previously, and asserted, "I would try to be fair . . . and put my personal experience aside." Id. at 1026. The court then requested, "But if it turns out you're going through this process and you feel you can't—it's not working, would you tell us?" To which the juror responded "Yes." Id. Later, the court asked a general question as to whether anyone felt they could not follow the principles in regard to the presumption of innocence and juror 3 did not respond in the affirmative. Id. The defense brought a for-cause challenge to juror 3. The district court denied the challenge, citing the fact that the juror did not respond in the affirmative to the general question of the venire. Id.

The Kechedzian court analyzed actual bias as to the juror and determined that the case was controlled by United States v. Gonzalez, which rejected the notion that equivocal answers regarding a juror's ability to be fair were sufficient to ensure a fair and impartial verdict. Id. at 1028-30 (citing Gonzalez, 214 F.3d 1109,

1113–14 (9th Cir. 2000)). The Ninth Circuit noted in particular that the jurors in both Gonzalez and Kechedzian were asked three separate times if they could remain impartial. Id. at 1030. The Kechedzian court rejected the argument that the general question regarding the presumption of innocence and the burden of proof was sufficient to provide any assurance that the juror could be impartial because those are distinct legal principles from impartiality. Id. at 1030–31. It further noted that the suggestion that the juror would inform the court if "it's not working" was not an acceptable resolution to addressing bias. Id.

The matter before us is similar to both Kechedzian and Gonzalez in that juror 40 indicated she had personal experience that led her to question whether she would be able to be impartial in her consideration of the case. Further, juror 40 was directly asked several times if she believed that she could be impartial, and each time she responded with equivocal answers and affirmative statements that she may be biased, like the jurors in Kechedzian and Gonzalez. Kechedzian, 902 F.3d at 1029; Gonzalez, 214 F.3d at 1111 (Responses of Kechedzian juror to inquiries about her ability to be impartial were: (1) "I might be able to put that aside;" (2) "I would want to put my personal stuff aside, but I honestly don't know if I could;" and (3) "I would try to be fair."; Gonzalez juror responses regarding being fair/impartial were: (1) "I will try to;" (2) "Right. I'll try;" and (3) "I'll try."). Here, we have equivocal responses to attempts at rehabilitation similar to those in these federal cases. When the State asked if she could "come to a conclusion at the end just based on the evidence that you hear in this courtroom," juror 40 replied "I could try." When the State tried again and asked directly if she could put her

emotions aside to "come to a conclusion of Mr. Talbott's innocence or guilt based on the evidence, and not based on anything, any other experience that you've had," she again only offered "I could try." When asked at oral argument to identify where the purported rehabilitation of juror 40 could be found in the record, the State offered nothing beyond this latter exchange. It is especially noteworthy that the concerns raised by juror 40 as to the sort of things which gave rise to her bias were in fact introduced by the State at trial; both violence against a young woman and accompanying graphic photos.

The State's argument that this court should reject Ninth Circuit case law based on substantive differences in our state case law, fails in light of a recent opinion from this division, Guevara Diaz, which expressly utilized Gonzalez and other federal cases to reach its ultimate conclusion. 11 Wn. App. 2d 843, 456 P.3d 869 (2020). This is necessarily because the federal constitution is implicated in cases where one is claiming a violation of their right to a fair trial and federal case law guides us as to the minimum standards for jury selection. Further, the State's argument seems to ignore the fact that seating a biased juror in a criminal trial in state court would still violate the federal constitution.

The State instead urges reliance on State v. Noltie, 116 Wn.2d 831, 809 P.2d 190 (1991). In Noltie, a juror stated that she "might" have difficulty being fair in the case. Id. at 836. However, that statement was followed by numerous clear indications of her rehabilitation, providing "The more I've listened to the Court and the more I participated in it, it seems that it would be a lot easier to be fair, but at first I was very apprehensive about it." Id. The Noltie juror then went even further

with her comments indicative of rehabilitation, expressly declaring that "it would be a terrible injustice to the defendant not to have a fair trial and not to have people see him as innocent."

Noltie was decided decades prior to Guevara Diaz and Gonzalez and therefore does not reflect the nuance that has developed in the case law over time. More critically here, though, is the fact that juror 40 did not provide an unequivocal statement indicative of her rehabilitation. In her final responses after the State's attempt to rehabilitate her, she reaffirmed that she remained unsure of her ability to set aside her bias. After questioning by the defense and the State, juror 40 was still not confident in her ability to overcome her clearly expressed bias, which involved the precise nature of allegations that went to the heart of this case ("some action taken towards a young woman") and the exact sort of graphic evidence introduced throughout the trial ("a flood of emotion might come over me, if I were to look at pictures that were very graphic, or . . . similar to something that I saw previously in my life and cloud my judgment"). This was a case centered on sexual and other physical violence against a woman, and a man based on his proximity to her, and necessarily required jurors to examine and consider graphic descriptions and visual evidence of such.

Finally, the statements juror 40 made that the State relies on for its argument that she was properly rehabilitated, are equivocal at best. The challenged juror in Noltie offered other statements beyond merely that they would try to set their bias aside, such that the court was assured that the juror understood their obligation to afford the accused a fair trial. We find this case to be most similar

- 11 -

to the Ninth Circuit's recent decisions regarding juror's equivocal answers, particularly in response to attempts for rehabilitation. The record before us contains no such statements by juror 40 that would demonstrate anything other than that she might be "a great juror on a different kind of case; it's just not this kind of case." After her clear, repeated expressions of actual bias as to the precise nature of the allegations at the heart of this trial and evidence which would be introduced, we cannot conclude that juror 40 was sufficiently rehabilitated such that Talbott was provided a fair and impartial jury. "Under Washington case law, a determination of actual juror bias cannot be harmless." State v. Wilborne, 4 Wn. App. 2d 147, 172, 420 P.3d 707 (2018). "Doubts regarding bias must be resolved against the juror." State v. Cho, 108 Wn. App. 315, 330, 30 P.3d 496 (2001); see also Gonzalez, 214 F.3d at 1114 (quoting Burton v. Johnson, 948 F.2d 1150, 1158 (10th Cir. 1991)). As such, denial of Talbott's for-cause challenge was error and we reverse.

At oral argument, the parties both indicated that this panel could address Talbott's other assignments of error even if we concluded that the juror issue was dispositive. We decline their invitation. In light of reversal, we similarly decline to reach the matters raised by Talbott in his statement of additional grounds for review.

No. 80334-4-I/13

Reversed.

WE CONCUR: